PUERTO RICO TELEPHONE COMPANY, querellante y recurrente, *v.* UNIÓN INDEPENDIENTE DE EMPLEADOS TELEFÓNICOS, querellada y recurrida.

*Número:* CE-87-465          *Resuelto:* 30 de junio de 1992

172

174

178

*Pedro Pumarada, Mario Arroyo Dávila, José Luis Verdiales Morales*, de *Fiddler, González & Rodríguez*, abogados de la

recurrente; *Leticia Rodríguez García, Luis B. Osorio Díaz*, abogados de la Junta de Relaciones del Trabajo; *Ángel Raúl Pérez Muñiz*, de *Pérez Muñiz & Santiago Meléndez*, abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

La controversia en los méritos del presente caso se circunscribe a determinar si es válida la norma del patrono Puerto Rico Telephone Company (en adelante P.R.T.C.) que prohibía a sus empleados unionados —que como parte de sus funciones usuales tienen contacto con el público— utilizar en sus uniformes durante sus horas laborables, y en medio de la negociación de un nuevo convenio colectivo, una leyenda en la que se leía: "Telefónicos exigimos Convenio Colectivo ¡Ahora!"

Resolvemos que tal norma no encuentra justificación en las circunstancias de autos.

I

El 20 de septiembre de 1982 venció el convenio colectivo, entonces vigente, entre la P.R.T.C. y la Unión Independiente de Empleados Telefónicos (en adelante la Unión). El 4 de octubre de ese año la P.R.T.C. y la Unión iniciaron negociaciones encaminadas a lograr un nuevo convenio colectivo.

En diciembre de 1982, sin que las partes hubieran alcanzado un acuerdo final, la P.R.T.C. elaboró unas normas relacionadas con el uso de uniformes y el uso de leyendas y/o insignias en éstos, así como en la vestimenta civil de sus empleados. A tales efectos, dispuso:

(a) se permite el uso de leyendas en horas no laborables a cualquier empleado de la Compañía,
(b) *no se le permite el uso de leyendas en horas laborables a los empleados que tienen contacto con el público o a empleados uniformados.* Sin embargo, dichos empleados pueden utilizar la

leyenda en horas no laborables, entiéndase la hora de almuerzo, y antes y después de entrar a trabajar y luego de salir de trabajar. (Énfasis suplido y escolio omitido.) Alegato en apoyo a recurso de apelación, pág. 2.

Mientras, la negociación colectiva entre las partes se estancó sin alcanzar acuerdos finales. La Unión, como medio de presión, celebró un sinnúmero de piquetes, marchas, conferencias de prensa, comparecencias públicas, etc. Como estrategia adicional —y para llevar al Pueblo y al patrono su mensaje en torno a las posiciones asumidas por ambas partes— los líderes de la Unión decidieron, alrededor del 12 de septiembre de 1983, instruir a sus miembros para que usaran en sus uniformes o vestimenta de trabajo la leyenda: "Telefónicos exigimos Convenio Colectivo ¡Ahora!"

Desde el 14 de septiembre de 1983 los unionados comenzaron a reportarse a sus trabajos con dicha leyenda (*sticker*) en sus uniformes y su vestimenta. Amparándose en las normas antes señaladas, la P.R.T.C. solicitó a los empleados que tenían contacto con el público, y que insistieron en utilizar la referida leyenda durante las horas laborables, que se desprendieran de ellas so pena de ser suspendidos. Al éstos hacer caso omiso fueron suspendidos. Sólo a los mensajeros se les permitió trabajar luego de cuatro (4) horas de suspensión.

Inconforme con tal acción, el 16 de septiembre de 1983, la Unión presentó ante el tribunal de instancia una demanda de *injunction*, sentencia declaratoria y de daños.

Además, tres (3) días después (19 de septiembre de 1983), presentó también ante la Junta de Relaciones del Trabajo (en adelante la Junta) unos cargos alegando práctica ilícita de trabajo. Art. 8 (1)(a) y (c) de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 69 (1)(a) y (c).

En la demanda de *injunction* la Unión invocó la jurisdicción del foro judicial bajo las disposiciones de la Ley

*Antiinjunction* de Puerto Rico, Ley Núm. 12 de 8 de agosto de 1974 (32 L.P.R.A. sec. 3524); de la Ley Núm. 140 de 23 de julio de 1974 (32 L.P.R.A. sec. 2871 *et seq.*); de la Ley de Derechos Civiles de Estados Unidos, 42 U.S.C. sec. 1983; de la Carta de Derechos de la Constitución de Estados Unidos y Puerto Rico y de la Regla 57 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Adujo que la actuación de la P.R.T.C. de prohibir el uso de las leyendas constituía una censura previa y supresión total del *derecho a la libre expresión de las ideas*; que ello había ocasionado y continuaba ocasionando daños irreparables a la Unión y sus miembros; que la Unión carecía de otro remedio en ley para vindicar sus derechos y que la orden de *injunction* no le ocasionaría daños a la P.R.T.C.

Solicitó, además, indemnización por los alegados daños sufridos a razón de cuarenta y cinco mil dólares ($45,000) por cada día en que la P.R.T.C. "hubiese incurrido y[/o] siga incurriendo en la conducta impugnada". Alegato en apoyo a recurso de apelación, pág. 3.

En los cargos por práctica ilícita presentados ante el foro administrativo, la Unión adujo que la actuación de la P.R.T.C. coartaba el derecho de los empleados a llevar *a cabo actividades concertadas de forma ordenada, pacífica y sin alusiones de deslealtad o lenguaje soez* o belicoso al amparo de los derechos garantizados por el Art. 4 de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 65. Le imputó a la P.R.T.C. la violación del Art. 8 (1)(a) y (c) de la Ley de Relaciones del Trabajo de Puerto Rico, *supra*.

El 21 de septiembre de 1983, la P.R.T.C. presentó ante el foro judicial una moción de desestimación al amparo de las doctrinas de jurisdicción primaria y agotamiento de remedios.

Trabada la controversia en el foro judicial, éste celebró una vista en la cual escuchó los argumentos de las partes. Luego de ello, denegó la moción de desestimación presentada por la P.R.T.C. por entender que el recurso planteaba

serias y sustanciales interrogantes y alegaciones de violaciones de los derechos constitucionales de los empleados, por lo que eran inaplicables al caso las normas de jurisdicción primaria o agotamiento de remedios administrativos para diferir el trámite a la Junta. Procedió a celebrar la vista sobre el *injunction*.

Por acuerdo de las partes, las vistas para el injunction preliminar y permanente fueron consolidadas. Según el foro de instancia, el presidente de la Unión:

> ... [T]estificó que el propósito de la Unión es que el uso de la leyenda es otro medio, unido a los marbetes, marchas, piquetes, conferencias de prensa y otras actividades, de informar al público y los abonados sobre las intransigencias, hostigamientos y suspensiones de empleados por parte del patrono. Se quejan de que los unionados no tienen plan médico. Lo principal es que quieren que el público se entere de las injusticias del patrono al no negociar un nuevo convenio a pesar de que el anterior venció hace cerca de un año. Apéndice, pág. 028.

El foro de instancia desestimó la demanda por entender que bajo las circunstancias del caso de autos el balance de derechos debía inclinarse a favor del patrono. Su razón de decidir se basó en que:

> ... [A]quí el patrono es una utilidad pública que depende del patrocinio de sus abonados y el servicio a éstos. Uno de los propósitos de la ley es mantener un sistema de comunicaciones eficiente el cual es esencial para las operaciones del Gobierno de Puerto Rico y para proseguir con el desarrollo económico del país en beneficio y para el bienestar general de los habitantes de Puerto Rico. 27 L.P.R.A. 403 (a). Dentro de ese contexto la compañía está justificada en velar que sus empleados dediquen todo su tiempo hábil a las labores asignadas dentro de su horario regular. El peligro de que esto no se logre si se permite el uso de la leyenda es real, no aparente. Apéndice, pág. 030.

De esta sentencia acudió la Unión ante este Foro en Recurso de apelación el 31 de octubre de 1983.

La P.R.T.C. se opuso a la expedición del auto sosteniendo que carecíamos de jurisdicción porque éste fue pre-

sentado fuera de tiempo ante la secretaria del tribunal apelado, así como que le fue notificado fuera de tiempo.

Mediante Resolución de 23 de noviembre de 1983 denegamos el recurso por falta de jurisdicción.

Sin embargo, el 18 de mayo de 1984 la Junta asumió jurisdicción sobre el asunto y expidió una querella contra la P.R.T.C. imputándole un cargo por práctica ilícita de trabajo en violación al citado Art. 8 (1)(a) y (c) de la Ley de Relaciones del Trabajo de Puerto Rico.

La P.R.T.C. sometió su contestación a la querella. Celebradas las correspondientes vistas, el caso quedó sometido ante la Hon. Oficial Examinadora (Lcda. Karen M. Loyola Peralta).

El 17 de octubre de 1985 la Hon. Oficial Examinadora de la Junta emitió su informe. Concluyó en éste que el foro judicial actuó sin jurisdicción en esta controversia, pues siendo una disputa obrero-patronal la jurisdicción primaria y *exclusiva* correspondía a la Junta y expuso que no eran aplicables las doctrinas de cosa juzgada y/o impedimento colateral por sentencia. Determinó que tampoco procedía la defensa de incuria, pues la Junta realizó sus labores investigativas en un término de tiempo razonable a la luz de las circunstancias del caso. Entendió, además, que por ser la Junta el foro exclusivo para dilucidar una alegada violación de los derechos conferidos por la Ley de Relaciones del Trabajo de Puerto Rico, no era necesario someter este asunto al arbitraje pactado por las partes.

Finalmente, en cuanto a los méritos del caso, resolvió que por no *existir circunstancias especiales* que justificaran que la P.R.T.C. prohibiera el uso de las controvertidas leyendas en los uniformes de sus empleados que tienen contacto con el público durante horas laborables, la P.R.T.C. había incurrido en una práctica ilícita de trabajo al intervenir indebidamente con el ejercicio de los derechos garantizados por el Art. 4 de la Ley de Relaciones del Trabajo de

Puerto Rico, *supra.*[1] En Consecuencia, recomendó a la Junta que ordenara a la P.R.T.C., sus ejecutivos, sucesores y cesionarios:

1. Cesar y desistir de interferir en lo sucesivo con los derechos garantizados a los empleados por el Artículo 4 de la Ley, específicamente el de realizar actividades concertadas a los fines de la negociación colectiva u otro fin de ayuda o protección mutua.

2. Tomar la siguiente acción afirmativa que consideramos ayuda a efectuar los propósitos de la Ley:

a) Satisfacer a los empleados de la querellada los salarios dejados de percibir al limitárseles la entrada a sus respectivos trabajos.

b) Fijar en sitios visibles de sus oficinas el Aviso que se una a la Decisión y Orden de la Junta, el cual deberá permanecer fijado por un término de treinta (30) dí[a]s consecutivos.

c) Notificar al Presidente de la Junta dentro de los veinte (20) días siguientes a la notificación de la Decisión y Orden de la Junta de las providencias tomadas para cumplir con lo ordenado.

El 26 de junio de 1987 la Junta emitió decisión y orden en la cual aceptó y adoptó las recomendaciones de la Hon. Oficial Examinadora.

De esa decisión y orden acude la P.R.T.C. ante nos señalando que:

A. Erró la Honorable Junta de Relaciones del Trabajo al no decidir que la aplicación de la doctrina de cosa juzgada (res judicata) impedía la tramitación de esta acción de la unión y empleados.

B. Erró la Honorable Junta de Relaciones del Trabajo, pues la doctrina de impedimento colateral por sentencia impedía la acción de la Unión y de los empleados.

C. Erró la Honorable Junta de Relaciones del Trabajo, pues la actuación del patrono no constituye una práctica ilícita de trabajo, sino que es una actuación válida, legítima y justificada

---

[1] La Oficial Examinadora encontró probada una violación al Art. 8 (1)(a) de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 69 (1)(a). Recomendó, sin embargo, la desestimación del cargo de práctica ilícita basado en el Art. 8 (1)(c) de tal ley, 29 L.P.R.A. sec. 69 (1)(c).

a tenor con los hechos del caso, las leyes laborales vigentes y la jurisprudencia aplicable.

D. Erró la Honorable Junta de Relaciones del Trabajo, al no determinar que carecía de jurisdicción, pues la Unión y los empleados no agotaron los remedios administrativos contenidos en el Convenio Colectivo. Alegato en apoyo a recurso de apelación, págs. 9–10.

Sometida la apelación, 29 L.P.R.A. sec. 70 (2)(b), las partes han comparecido. Resolvemos.

## II

Consideramos, en primer lugar, los señalamientos de error que van dirigidos a cuestionar la jurisdicción de la Junta en el caso ante nos.[2]

Sostiene la P.R.T.C. que en este caso la Junta carecía de jurisdicción por ser aplicables a los hechos de autos las doctrinas de cosa juzgada y/o impedimento colateral por sentencia. Según la P.R.T.C., la sentencia dictada anteriormente por el foro judicial impedía que se litigara en el foro administrativo las cuestiones ya litigadas y adjudicadas en la acción anterior. Arguye que por haberse planteado, litigado y adjudicado ante el Tribunal Superior el derecho constitucional de los empleados unionados de la P.R.T.C. a *la libre expresión y organización*, derechos que también protege la Ley de Relaciones del Trabajo de Puerto Rico, y tratándose de las mismas partes y el mismo asunto, no podía la Junta asumir jurisdicción sobre el cargo de práctica ilícita. No tiene razón.

Sin duda que las doctrinas de cosa juzgada e impedimento colateral por sentencia se pueden levantar ante el foro administrativo a base de una decisión judicial previa entre las mismas partes siempre que concurran los requi-

---

[2] Los errores identificados (A), (B) y (D) en el alegato de la Puerto Rico Telephone Company.

186

sitos necesarios para su reconocimiento. *Pagán Hernández v. U.P.R.*, 107 D.P.R. 720 (1978); *A & P Gen. Contractors v. Asoc. Caná*, 110 D.P.R. 753 (1981).

Sin embargo, el presente caso requiere deslindar la naturaleza de los hechos y las controversias que lo originan antes de aplicar con automatismo estas doctrinas legales.

### III

■ La sección cuarta de la Carta de Derechos de nuestra Constitución consagra el derecho de los individuos a expresarse libremente. Art. II, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1. La sección sexta del mismo cuerpo consagra el derecho de las personas a asociarse y organizarse libremente para cualquier fin lícito. Art. II, Sec. 6, Const. E.L.A., L.P.R.A., Tomo 1. También la Constitución de Estados Unidos, por medio de sus enmiendas primera y decimocuarta, protege esos derechos en Puerto Rico.

■ De ambos derechos se ha dicho que son esenciales para la consecución y el ejercicio de la libertad de conciencia y, por ello, son acreedores a la más celosa protección de parte de los tribunales. *Cf. Rodríguez v. Srio. de Instrucción*, 109 D.P.R. 251 (1979). Ordinariamente la vindicación de estos derechos corresponde a los tribunales. *Kelly v. United States Postal Serv.*, 492 F. Supp. 121 (S.D. Oh. 1980).

■ Por otra parte, la sección decimoséptima de nuestra Carta de Derechos le garantiza a los trabajadores, por ella cubiertos, el derecho a organizarse y a negociar colectivamente con sus patronos a través de representantes seleccionados por ellos para la promoción de su bienestar. Art. II, Sec. 17, Const. E.L.A., L.P.R.A., Tomo 1. Como corolario de ese derecho, la sección decimoctava le reconoce la prerrogativa de, en sus relaciones directas con sus patronos, realizar huelgas y piquetes, así como cualquier otra activi-

dad concertada lícita, *claro está sin menoscabo de la facultad que se reserva la Asamblea Legislativa de aprobar leyes para reglamentar esas actividades en caso de grave emergencia en que la salud, la seguridad pública o los servicios públicos esenciales estén claramente en peligro.* Art. II, Sec. 18, Const. E.L.A., L.P.R.A., Tomo 1. *Cf. A.A.A. v. Unión Empleados A.A.A.*, 105 D.P.R. 437 (1976); *Morales Morales v. E.L.A.*, 126 D.P.R. 92 (1990).

Ese mandato constitucional toma concreción en la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 61 *et seq.* El Art. 4 de dicha ley, expresamente reconoce que:

> Los empleados tienen derecho, entre otros, a organizarse entre sí; a constituir, afiliarse o ayudar a organizaciones obreras; negociar colectivamente a través de representantes por ellos seleccionados; y dedicarse a actividades concertadas con el propósito de negociar colectivamente u otro fin de ayuda o protección mutua. 29 L.P.R.A. sec. 65.

Como corolario de esos derechos la ley dispone que:

> (1) Será práctica ilícita de trabajo el que un patrono, actuando individualmente o concertadamente con otros:
> (a) Intervenga, restrinja, ejerza coerción o intente intervenir, restringir o ejercer coerción con sus empleados en el ejercicio de los derechos garantizados por la sec. 65 de este título. 29 L.P.R.A. sec. 69 (1)(a).

En *F.S.E. v. J.R.T.*, 111 D.P.R. 505, 512 (1981), expresamos que:

> Como garantía de esos derechos de organización y negociación, la Ley de Relaciones del Trabajo prohíbe aquellas actividades que interfieren con su pleno disfrute y que constituyen por ello prácticas ilícitas del trabajo. *La Junta es, por disposiciones de ley, el "tribunal adecuado, eficaz e imparcial" para implantar la política pública obrero-patronal, fomentar las prácticas y procedimientos de la negociación colectiva y evitar que cualquier persona se dedique a prácticas ilícitas del trabajo.* 29 L.P.R.A. sec. 62 (4). *Esta última facultad es de carácter ex-*

*clusivo y no le afecta ningún otro medio de ajuste o prevención, salvo circunstancias especiales.* 29 L.P.R.A. sec. 68.

En efecto, sin la prevención por la Junta de las prácticas ilícitas del trabajo los derechos de negociación y organización de los empleados del Fondo resultarían ineficaces, quedarían en virtual desamparo. Podría argüirse, sin embargo, que los tribunales siempre conservan facultad para vindicar estos derechos. *Pero precisamente la Ley de Relaciones del Trabajo sustrajo de la jurisdicción ordinaria de los tribunales esa facultad, porque se consideró que solo un organismo especializado y diseñado exclusivamente para ese propósito, como es la Junta de Relaciones del Trabajo, podría dar plena eficacia a los derechos de organización y negociación colectiva.* No podemos concebir, entonces, que la Legislatura otorgara unos derechos tan fundamentales a la política pública obrero-patronal y no prohibiera al Fondo el interferir o el menoscabar en cualquier forma el libre ejercicio de esos derechos, ni tampoco confiriera jurisdicción al organismo precisamente creado para garantizar el cumplimiento de la política pública. De lo contrario, se habría conferido a la Junta una jurisdicción mutilada en su función preventiva, inconciliable con el diseño integral del estatuto.

En consecuencia, debemos concluir que la jurisdicción conferida a la Junta por la Ley Núm. 103, *supra,* se extiende tanto a los procedimientos para la certificación de la unidad apropiada como a la aplicación de los mecanismos diseñados por el legislador para garantizar los derechos de organización y negociación colectiva. (Énfasis suplido.)

▮ De suerte que, por mandato expreso de ley, corresponde a la Junta la *facultad exclusiva* para evitar las prácticas ilícitas del trabajo de los patronos que inciden sobre los derechos concedidos por la Ley de Relaciones del Trabajo de Puerto Rico a los obreros unionados. 29 L.P.R.A. sec. 68. Véase, además, *Asoc. de Guardianes v. Bull Line,* 78 D.P.R. 714 (1955).

▮ Ciertamente algunas situaciones conflictivas entre obreros y patronos presentan una imbricación de derechos y remedios en conflicto que necesita, de entrada, la dilucidación del foro que debe asumir jurisdicción: si el judicial o el administrativo. La clave está en determinar *la esencia y naturaleza* de la actividad que los obreros llevan a cabo. *Si*

*por su naturaleza la actividad directamente se relaciona
con los derechos protegidos por el estatuto y por su esencia
está enmarcada dentro de un conflicto obrero-patronal*; la
actividad será protegida por la Ley de Relaciones del Tra-
bajo de Puerto Rico y corresponderá a la Junta asumir ju-
risdicción exclusiva, sin afectar dicha jurisdicción ningún
otro medio de ajuste o prevención, salvo en circunstancias
especiales. Art. 7(a) de la Ley de Relaciones del Trabajo de
Puerto Rico, 29 L.P.R.A. sec. 68(a). Bajo tal definición caen,
*de ordinario*, las actividades concertadas para ayuda o pro-
tección mutua.

▮▮▮▮▮▮▮ La utilización, por parte de los empleados, de
botones, insignias y mensajes en sus uniformes alusivos a
una disputa obrero-patronal durante horas laborales *es
una actividad esencialmente protegida por el manto de la
Ley de Relaciones del Trabajo de Puerto Rico* (*cf.: Republic
Aviation Corp. v. Board*, 324 U.S. 793 (1945); *Serv-Air Inc.
v. N.L.R.B.*, 395 F.2d 557 (10mo Cir. 1968), independiente-
mente de que con tales mensajes los obreros ejercen tam-
bién su derecho constitucional a la libre expresión de sus
ideas. Art. II, Secs. 4 y 6, Const. E.L.A., *supra*. Ésta se
vislumbra como una actividad concertada para propósitos
de ayuda o protección mutua de los empleados. Art. 4 de la
Ley de Relaciones del Trabajo de Puerto Rico, *supra; J.R.T.
v. Morales*, 89 D.P.R. 777, 779–780 (1964).(³) La controver-
sia sobre la cual gira el uso de la leyenda en este caso está
relacionada con los términos y las condiciones de empleo
que se estaban negociando; se realizó buscando el beneficio
de todos los unionados ya que su propósito era buscar
apoyo del público y los abonados de la P.R.T.C. a su posi-

---

(³) *Valga aclarar que no toda actividad que los empleados lleven a cabo en con-
cierto es una actividad concertada protegida por la ley. Aun cuando esté animada por
un propósito legítimo es necesario examinar si la manera en que se lleva a cabo la
actividad está cubierta por la protección de la ley. Labor Board v. Electrical Workers*,
346 U.S. 464 (1953); *J.R.T. v. Morales*, 89 D.P.R. 777, 779–780 (1964). *Si se utilizan
medios ilegales no está protegida por la ley.*

ción, así como crear presión sicológica sobre la P.R.T.C.; se buscaba un remedio específico y, finalmente, tenía un propósito legal siguiendo medios legales. *Cf.* D. Fernández y C. Romany, *Derecho Laboral*, Ed. U.P.R., 1987, T. I, pág. 563.

## IV

La P.R.T.C. es una instrumentalidad corporativa del E.L.A. que esencialmente se dedica a prestar servicios al pueblo utilizando empleados para ello. Dentro del marco legal en que opera, ocupa un *status* de corporación público-privada en el que debe garantizar los derechos constitucionales a sus empleados. *Torres Ponce v. Jiménez*, 113 D.P.R. 58 (1982); *Torres Solano v. P.R.T.C.*, 127 D.P.R. 499 (1990); *Pueblo v. Hernández Torres y Barreda*, 125 D.P.R. 560 (1990).

Pero, además, la P.R.T.C. es un patrono cubierto por la Ley de Relaciones del Trabajo de Puerto Rico. 29 L.P.R.A. sec 63(2) y (11). Por lo tanto, tiene la obligación de garantizar los derechos que dicha ley le reconoce a sus empleados unionados cubiertos por convenios colectivos. 29 L.P.R.A. sec. 65.

La presente disputa obrero-patronal está *esencial y directamente relacionada* con el ejercicio de los derechos constitucionales y estatutarios de sus empleados unionados consagrados en el Art. II, Secs. 17 y 18 de la Constitución del Estado Libre Asociado, *supra*, y en el Art. 4 de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 65.

El hecho de que incidentalmente éste también presente un reclamo obrero a sus derechos de libre expresión y asociación, Art. II, Secs. 4 y 6, Const. E.L.A., *supra*, no desvirtúa de por sí tal naturaleza, a fin de conceder jurisdicción original al foro judicial. De hecho, la P.R.T.C. soli-

citó la desestimación de la demanda de *injunction* instada por la Unión que se fundamentaba en tales derechos, por entender que el foro judicial carecía de jurisdicción por no haber acudido la Unión a la Junta, agencia con jurisdicción exclusiva. El foro de instancia rechazó tal solicitud a base de jurisprudencia relacionada con la doctrina de jurisdicción primaria concurrente. Véase *Colón v. Méndez, Depto. Recursos Naturales*, 130 D.P.R. 433 (1992). Tal doctrina resultaba inaplicable a este caso, pues aquí prevalecía la jurisdicción primaria exclusiva de la Junta ante una disputa obrero-patronal.(⁴) Bajo tal doctrina la Unión estaba impedida de preterir el trámite administrativo en las circunstancias de este pleito.

En el caso de autos, correspondía a la Junta la jurisdicción primaria exclusiva para entender en esta disputa que está enmarcada dentro de un conflicto obrero-patronal y directamente relacionada con una actividad concertada protegida por la Ley de Relaciones del Trabajo de Puerto Rico. Aquí la Unión preterió el trámite y acudió en primera instancia ante el foro judicial. Incumplió así con *la condición esencial previa de acudir al foro competente.* No le dio oportunidad a dicho foro administrativo para que desarrollara un historial completo del asunto; aplicara su conocimiento especializado para adoptar medidas correctivas de conformidad con la política pública que formula la entidad;

---

(⁴) Contrario a la doctrina de jurisdicción primaria concurrente, bajo la doctrina de jurisdicción primaria exclusiva la ley que crea la agencia administrativa dispone que dicho organismo será el *único* que tendrá jurisdicción original para examinar la reclamación. En circunstancias excepcionales hemos reconocido que un litigante *no tiene que concluir o agotar* dicho trámite *iniciado* en la agencia por estar presente: (a) una cuestión de derecho que no requiere el ejercicio de discreción administrativa; (b) una violación de patente intensidad a los derechos civiles del individuo que reclama urgente reparación; (c) un remedio administrativo inútil o inadecuado; (d) un peligro de daño inminente, o (e) una clara ausencia de jurisdicción de la agencia. Véanse: Sec. 4.3 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 2173; *Colón v. Méndez, Depto. Recursos Naturales*, 130 D.P.R. 433 (1992); *Brunet Justiniano v. Gobernador*, 130 D.P.R. 248 (1992); *Mercado Vega v. U.P.R.*, 128 D.P.R. 273 (1991), y *Rivera v. E.L.A.*, 121 D.P.R. 582 (1988).

ni le permitió poner en vigor la ley que administra la agencia. En tales circunstancias, el foro judicial carecía de jurisdicción para dilucidar inicialmente la controversia relacionada con la actividad concertada de los obreros. Resultaba prematuro analizar si estaba presente alguna de las excepciones para no tener que agotar el trámite administrativo pues cuando se inició la acción judicial no se acudió antes a dicho trámite según ordenaba la ley. *Cf. Rivera v. E.L.A.*, 121 D.P.R. 582 (1988).

Además, la Ley Núm. 50 de 4 de agosto de 1947 (29 L.P.R.A. secs. 101–109) le prohibía al foro judicial considerar la *solicitud de injunction de la Unión por tratarse el asunto de una disputa obrero-patronal.* De la propia demanda de *injunction* surgía el conflicto obrero existente entre las partes. Alegaciones 7 y 8 de la demanda. Allí se expresa que las partes venían intentando negociar un convenio colectivo desde el 4 de octubre de 1982 y no habían podido llegar a un acuerdo.

La Ley Núm. 50, *supra,* conocida como la pequeña Norris —La Guardia— se aprobó para prohibir a los tribunales expedir órdenes de entredicho o de *injunction* en caso de huelgas o disputas obrero-patronales. Solamente se permite a los tribunales expedir dichas órdenes *en tales conflictos* cuando se dan los requisitos de violencia inminente y prevención de actos criminales, y en los que la Policía certifica que no puede brindar una protección adecuada a la propiedad del solicitante (29 L.P.R.A. sec. 105; *El Imparcial, Inc. v. Brotherhood, etc.*, 82 D.P.R. 164 (1961); *J.R.T. v. UTAMA*, 92 D.P.R. 373 (1965)), o cuando existe una grave emergencia por motivo de la cual están claramente en peligro la salud o la seguridad pública (Art. II, Sec. 18, Const. E.L.A., *supra*; 29 L.P.R.A. secs. 91–97).

En este caso no estaban presentes esas circunstancias cuando la Unión acudió al foro judicial a solicitar el *injunction.*

En resumen, en este caso se trataba de una actividad

concertada cubierta por la Ley de Relaciones del Trabajo de Puerto Rico. La controversia caía bajo la jurisdicción primaria exclusiva de la Junta, organismo que debía pasar juicio sobre si la norma implantada por la P.R.T.C. —que prohibía el uso de leyendas a aquellos empleados unionados que tuvieran contacto con el público durante horas laborables— constituía o no una práctica ilícita de trabajo del patrono. El foro judicial carecía de jurisdicción para dilucidar inicialmente esta disputa obrero-patronal. La Ley Núm. 50, *supra*, prohibía al foro judicial asumir jurisdicción en la solicitud del *injunction* instado por la Unión.

En tales circunstancias ¿aplican las doctrinas de cosa juzgada e impedimento colateral por sentencia? Resolvemos que no.

Para que estas doctrinas apliquen a un caso posterior se requiere que previamente exista una sentencia *válida* y definitiva que adjudique una reclamación en los méritos y que *haya sido dictada con jurisdicción por el foro pertinente.* Art. 1204 del Código Civil, 31 L.P.R.A. sec. 3343; *Tartak v. Tribl. de Distrito,* 74 D.P.R. 862, 870 (1953); *Seijo v. Mueblerías Mendoza,* 106 D.P.R. 491 (1977). Una sentencia nula, por haber sido dictada sin jurisdicción, "nada significa en cuanto a los hechos que se pretendieron litigar y en consecuencia no opera como cosa juzgada ....". *Tartak v. Tribl. de Distrito,* supra, pág. 870.

Ante similar planteamiento al aquí considerado, resolvimos en *J.R.T. v. Hosp. de la Concepción,* 114 D.P.R. 372, 381–382 (1983), que:

> El argumento pierde de vista que la obligación de rembolsar a los trabajadores despedidos los salarios dejados de devengar forma parte integral de la facultad exclusiva de la Junta de efectuar la política pública adoptada en la Ley de Relaciones del Trabajo de Puerto Rico, Art. 9 (29 L.P.R.A. sec. 70 (1)(b)). *Por disposición expresa de la Ley, Art. 7 (29 L.P.R.A. sec. 68 (a)), esta facultad exclusiva de la Junta para evitar la comisión de práctica ilícita no será afectada por ningún otro medio de ajuste*

*o prevención*. Véase *F.S.E. v. J.R.T.*, 111 D.P.R. 505, 512–513 (1981).

En la jurisdicción federal la Ley Wagner también reconoce la autoridad de la Junta Nacional para ordenar la reposición de empleados, abonándose o no la paga retroactiva. 29 U.S.C.A. sec. 160(c). Bajo esta disposición se ha resuelto que tanto la orden de reposición como la paga retroactiva corresponde a la jurisdicción exclusiva de la Junta Nacional y no de los tribunales. *N.L.R.B. v. Armstrong Tire & Rubber Co., Tire Test Fl. Br.*, 263 F.2d 680, (5th. Cir. 1959).

*La ausencia de jurisdicción en el Tribunal Superior para entender en el caso CS-73-4473 impide a la Junta la aplicación de la defensa de cosa juzgada.* (Énfasis suplido.)

■ Finalmente, estas doctrinas no aplican inflexiblemente cuando con ello se derrota un principio de política pública enmarcado en la ley. *Cf. Granados Navedo v. Rodríguez Estrada I*, 124 D.P.R. 1 (1989), y casos allí citados. Aplicarlas en este caso derrotaría la facultad exclusiva de la Junta de efectuar la política pública adoptada en la Ley de Relaciones del Trabajo de Puerto Rico en cuanto a la reglamentación de las prácticas ilícitas del trabajo y el ejercicio de actividades concertadas durante un conflicto obrero-patronal.

Por ello concluimos que la sentencia dictada por el foro judicial en el pleito de *injunction*, por haber sido dictada sin jurisdicción, no da base para aplicar las doctrinas invocadas por la P.R.T.C.

## V

La P.R.T.C. aduce, además, que la Junta carecía de jurisdicción porque la Unión no agotó el remedio contractual del arbitraje dispuesto en el convenio colectivo antes de acudir a la Junta con el cargo de práctica ilícita. Tampoco tiene razón.

■ El convenio colectivo entre la P.R.T.C. y la Unión, que estuvo vigente con anterioridad a los hechos en contro-

versia, contenía una cláusula reguladora del procedimiento de querellas (Art. XLVIII del Convenio Colectivo). Ésta establece el arbitraje como mecanismo para resolver querellas relacionadas con la interpretación, aplicación, administración o alegada violación del convenio. Esta es una cláusula amplia de arbitraje. *Cf.: U.I.L. de Ponce v. Dest. Serrallés Inc.*, 116 D.P.R. 348 (1985); *World Films, Inc. v. Paramount Pict. Corp.*, 125 D.P.R. 352 (1990). Hemos sostenido que, ante una cláusula amplia de arbitraje, subsiste la obligación de las partes de someter a ese mecanismo contractual de resolución de disputas aquellas querellas arbitrables que surjan aun luego de expirado el convenio. *J.R.T. v. A.F.F.,* 111 D.P.R. 837, 841 (1982).(⁵)

Ahora bien, en *Vega Colón v. Corp. Azucarera de P.R.*, 123 D.P.R. 859, 863 (1989), señalamos:

Es principio de derecho firmemente establecido que es la Junta de Relaciones del Trabajo quien ostenta, con carácter exclusivo, la jurisdicción en casos de práctica ilícita del trabajo. *F.S.E. v. J.R.T.*, 111 D.P.R. 505 (1981); *J.R.T. v. A.C.A.A.*, 107 D.P.R. 84 (1978). No obstante, la propia Junta *de Relaciones del Trabajo* ha adoptado la doctrina de agotamiento de remedios contractuales, esto es, *que no habrá de entender en casos de violación de convenio colectivo* hasta tanto las partes no hayan agotado los remedios provisto' en el convenio colectivo para la solución de sus problemas. *J.R.T. v. A.C.A.A., supra; San Juan Mercantile Corp. v. J.R.T.*, 104 D.P.R. 86 (1975). (Énfasis suplido.)

Esa norma de abstención, sin embargo, sólo la aplica la Junta cuando el caso trata *sobre una violación de convenio colectivo* para la cual se ha provisto por las partes el reme-

(⁵) Para una exposición de esta norma en el derecho laboral federal véanse: *Nolde Bros., Inc. v. Bakery Workers*, 430 U.S. 243 (1977); *Steelworkers v. American Smelting Co.*, 107 L.R.R.M. 2258 (3er Cir. 1981); *Federated Metals Corp. v. Steelworkers*, 107 L.R.R.M. 2271 (3er Cir. 1981); *Mine Workers v. Jericol Mining, Inc.*, 107 L.R.R.M. 2380 (1980); *Wilkes-Barre Pub. Co. v. Newspaper Guild*, 107 L.R.R.M. 2296 (1980); *Steelworkers v. Fort Pitt Steel Casting*, 105 L.R.M.M. 3232 (3er Cir. 1980); *N.L.R.B. v. Haberman Const. Co.*, 618 F.2d 288 (5to Cir. 1980); *Industrial Union of Marine & Shipbuilding Wkrs. v. N.L.R.B.*, 320 F.2d 615 (1963).

dio administrativo de arbitraje. *Cf.: Simmons Internatio-nal, Ltd., Etc.*, 2 DJRT 238, 250–251 (1953); *Autoridad de Comunicaciones de P.R. y Unión Independiente de Emplea-dos de la Autoridad de Comunicaciones*, CA 5958 de 14 de mayo de 1981 D-855. Ese no es el caso ante nos.

■   *Aquí no se trata de una violación al convenio co-lectivo, sino de una violación a los derechos estatutarios y constitucionales de los unionados que alegadamente confi-gura una práctica ilícita de trabajo por parte del patrono.* En tales casos la Junta es quien ostenta la jurisdicción exclusiva. 29 L.P.R.A. sec. 62(4); *Vega Colón v. Corp. Azu-carera de P.R.*, supra.

Cuando se trata de un caso de práctica ilícita por ale-gada violación al Art. 4 de la Ley de Relaciones del Trabajo de Puerto Rico, *supra*, sobre actividades concertadas en el curso de una negociación colectiva, no tiene cabida el prin-cipio de agotamiento de remedios contractuales. *Cf.: J.R.T. v. A.C.A.A.*, 107 D.P.R. 84 (1978); *F.S.E. v. J.R.T.*, 111 D.P.R. 505 (1981). De igual modo, ante tales circunstan-cias, resulta inaplicable la norma de agotamiento del reme-dio arbitral reconocida por nuestra jurisprudencia en casos en los que están involucradas controversias fundadas en la constitución o leyes aprobadas a su amparo. *Nazario v. Tri-bunal Superior*, 98 D.P.R. 846 (1970); *Rivera Adorno v. Au-toridad de Tierras*, 83 D.P.R. 258 (1961); *Pérez v. Autoridad de Fuentes Fluviales*, 87 D.P.R. 118 (1963); *J.R.T. v. A.F.F.*, supra; *Pagán v. Fund. Hosp. Dr. Pila*, 114 D.P.R. 224 (1983).

Los casos citados anteriormente comprenden actuacio-nes y/o controversias cuyo trámite y cuya resolución esta-ban considerados por el arbitraje pactado en el convenio, esto es, eran actuaciones y controversias que comprendían una violación del convenio colectivo pactado por las partes o quejas relativas a la aplicación o administración de dicho convenio. Ésa no es la situación en el caso ante nos. Aquí

estamos ante una causa de acción fundada en el derecho de los empleados a realizar actividades concertadas. La cláusula contractual no faculta al Comité de Quejas a entrar a dilucidar este tipo de controversia surgida en virtud de los derechos consagrados en el Art. II, Sec. 18, Const. E.L.A., *supra*, y en el Art. 4 de la Ley de Relaciones del Trabajo de Puerto Rico, *supra*. Correspondía a la Junta la determinación de si el patrono intervino o restringió injustificadamente esa actividad y si ello constituyó la alegada práctica ilícita imputada por la Unión. La jurisdicción de la Junta sobre ese asunto es exclusiva.

## VI

Las conclusiones a las que hemos llegado nos llevan a la médula de esta controversia: ¿Era válida la norma decretada por la P.R.T.C. que prohibía a sus empleados unionados —que como parte de sus funciones usuales tenían contacto con el público— usar en sus uniformes durante horas laborables una leyenda que leía "Telefónicos Exigimos Convenio Colectivo ¿Ahora!" o si, por el contrario, incurrió la P.R.T.C. en una práctica ilícita de trabajo, a tenor con lo dispuesto en el Art. 8(1)(a) de la Ley de Relaciones del Trabajo de Puerto Rico, *supra*, al prohibir su uso en estas circunstancias?

Esta es una cuestión novel. Ninguna de nuestras decisiones se ha enfrentado a idéntica controversia. *Cf. E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436 (1975) (piquete frente a la casa de un jefe de agencia).

En *Rodríguez v. Srio. de Instrucción*, supra, este foro se expresó sobre una controversia parecida a la de autos pero ante un reclamo de libertad de expresión en el ámbito laboral. En *Rodríguez v. Srio. de Instrucción*, supra, se trataba de la regulación impuesta por el Departamento de Instrucción Pública que impedía a la Federación de Maestros de Puerto Rico comunicarse con los maestros de escue-

las públicas durante la hora de almuerzo para poder reclu-
tar miembros para dicha federación.

Al confirmar una sentencia de *injunction* que permitió
el acceso a los representantes de la Federación *a las escue-
las públicas durante la hora de almuerzo, reconocimos que
un reclamo de este derecho en el ámbito laboral no es abso-
luto, sino que puede subordinarse a otros intereses en cir-
cunstancias en que la convivencia y necesidad pública así
lo exijan*; norma que hoy reiteramos.([6])

Debemos comenzar señalando que no estamos ante un
reclamo al derecho de libre expresión de un mensaje de
naturaleza político o social, *Kelly v. United States Postal
Serv.*, supra, sino ante un reclamo de protección ante una
alegada práctica ilícita por la prohibición de un mensaje
*directamente relacionado con un conflicto obrero-patronal
entre las partes.*

En el ámbito de los conflictos obrero-patrona-
les la jurisprudencia federal([7]) ha sido fructífera al desa-
rrollar normas reguladoras del uso de mensajes por los
unionados durante un conflicto obrero-patronal. La doc-
trina general reconoce que el unionado, en ausencia de cir-
cunstancias especiales, tiene derecho a usar en su uni-
forme botones, leyendas, insignias y objetos análogos,

---

([6]) Nótese que en dicho caso se trataba de escuelas públicas que son entidades
gubernamentales no sujetas a la Ley de Relaciones del Trabajo de Puerto Rico.

([7]) La Sec. 7 de la Ley Taft Hartley, 29 U.S.C. sec. 141, recoge estatutariamente
la protección de aquellas actividades concertadas por los empleados unionados. La
Sec. 8(a)(1) de dicha ley, 29 U.S.C. sec. 158(a)(1), establece que será práctica ilícita
del patrono interferir, restringir o coartar el ejercicio de dichas actividades concerta-
das protegidas por la Sec. 7, *supra*. Por ello, podemos recurrir a las disposiciones de
dicha ley, a las decisiones de la Junta Nacional de Relaciones del Trabajo y a la
jurisprudencia federal interpretativa de dichas disposiciones como fuente persuasiva
en la interpretación de nuestra ley. Vale recordar, sin embargo, que la protección de
las actividades concertadas en nuestra jurisdicción, contrario a la jurisdicción fede-
ral, tiene raíces constitucionales (Art. II, Secs. 17 y 18, Const. E.L.A., L.P.R.A., Tomo
1) y nuestro estatuto laboral tiene su antecedente legislativo en la Ley Wagner de
1935 que brinda una protección más amplia a dichas actividades concertadas que la
que brinda la Ley Taft Hartley, *supra*. *Cf.* Fernández y Romany, *op. cit.*, pág. 39 *et
seq.*

durante horas laborables, con mensajes alusivos a la unión
y/o sus relaciones laborales con el patrono, como válido
ejercicio de su derecho a llevar a cabo actividades concer-
tadas para su beneficio y el de los demás unionados.
Véanse: *Pay'n Save Corp. v. N.L.R.B.*, 641 F.2d 697 (9no
Cir. 1981); *Davison-Paxon Co., Div. of R.H. Macy & Co. v.
N.L.R.B.*, 462 F.2d 364 (5to Cir. 1972); *Burger King Corp. v.
N.L.R.B.*, 725 F.2d 1053 (6to Cir. 1984); *Midstate Telephone
v. N.L.R.B.*, 113 L.R.R.M. 2213 (2do Cir. 1983); *Southwes-
tern Bell Telephone Co.*, 200 N.L.R.B. 667 (1972); *Service
Employees International*, 198 N.L.R.B. 10 (1972); *Stan-
dard Fittings Co., Etc.*, 133 N.L.R.B. 928 (1961); *Bilton In-
sulation, Inc.*, 129 N.L.R.B. 1296 (1961); *The DeVilbiss
Company*, 102 N.L.R.B. 1317 (1953); *Spielman Motor Sa-
les, Inc.*, 127 N.L.R.B. 322 (1960); C.J. Morris, *The Develo-
ping Labor Law*, 2da ed., Ed. A.B.A., 1983, T. 1, págs.
96–98 y Sup.1982–1986, págs. 22–23; 2 *Jenkins, Labor
Law* Sec. 5.31 (Supl.1974).

██ *El análisis de estos casos fue considerado por el Tri-
bunal Supremo federal en Republic Aviation Corp. v.*
Board, supra, págs. 801–803, *como uno de balance de inte-
reses en el que se contrapone el derecho del unionado a
utilizar las insignias o mensajes en cuestión como parte de
una actividad concertada vis-á-vis el derecho del patrono
de mantener la producción y disciplina en su negocio.* Bajo
ese análisis corresponde al patrono el peso de probar que
su política que restringe el uso de leyendas está justificada
por *consideraciones o circunstancias* especiales. *Pay'n Save
Corp. v. N.L.R.B.*, supra. El balance de derechos debe ir
contra la restricción por parte del patrono. *Midstate Tele-
phone v. N.L.R.B.*, supra. Ello, con mayor razón en nuestra
jurisdicción, puesto que las actividades concertadas prote-
gidas por nuestra ley tienen rango constitucional. De igual
manera, de gran peso deben ser las circunstancias especia-
les esgrimidas por el patrono para justificar su prohibición.

■ Aquí la Unión plantea que la utilización del mensaje iba dirigido a efectuar los propósitos que protege el Art. 4 de la Ley de Relaciones del Trabajo de Puerto Rico, *supra*, esto es, promover la negociación colectiva, con el apoyo del público y los abonados, para beneficio y protección mutua de los unionados. La interferencia de la P.R.T.C. con el ejercicio de dicha actividad concertada puede constituir una violación del Art. 8(1)(a) de la Ley de Relaciones del Trabajo de Puerto Rico, *supra, a no ser que ésta demuestre que existían circunstancias especiales que justifican su prohibición.*

A manera ilustrativa, vale la pena examinar la jurisprudencia federal y las decisiones de la Junta Nacional de Relaciones del Trabajo (en adelante Junta Nacional) para constatar qué tipo de circunstancias se consideran especiales para sostener la prohibición y cuáles han fracasado en pasar el crisol judicial o cuasi judicial de la Junta Nacional.

En la jurisdicción federal el caso principal sobre el uso de insignias, botones, etc., de la Unión —durante conflictos obreros y en horas laborables— es *Republic Aviation Corp. v. Board*, supra. Allí el patrono despidió a varios empleados luego de que éstos se negaron a quitarse una insignia (*buttons*) de la unión que buscaba organizar sindicalmente a los empleados. Según el patrono, su actuación respondió a que consideraba que la unión no era el representante debidamente designado por los empleados y que permitir su uso violaría la política del patrono de mantener estricta neutralidad con relación a las uniones, así como podía interferir con el sistema de quejas y agravios existente en la corporación.

La Junta Nacional encontró al patrono incurso en práctica ilícita. El Tribunal Supremo federal confirmó a la Junta Nacional en este aspecto. Al hacerlo señaló:

These cases bring here for review the action of the National

Labor Relations Board in working out an adjustment between the undisputed right of self-organization assured to employees under the Wagner Act and the equally undisputed right of employers to maintain discipline in their establishments. Like so many others, these rights are not unlimited in the sense that they can be exercised without regard to any duty which the existence of rights in others may place upon employer or employee. Opportunity to organize and proper discipline are both essential elements in a balanced society. *Republic Aviation Corp. v. Board*, supra, págs. 797–798.

Adviértase que este caso fue resuelto bajo las disposiciones de la Ley Wagner, 49 Stat. sec. 449 *et seq.*, predecesora de nuestra Ley de Relaciones del Trabajo de Puerto Rico.

Ese análisis de balance de intereses es el que ha sido utilizado tanto por los tribunales federales apelativos así como por la Junta Nacional al enfrentarse a la controversia que nos ocupa.

Para ver algunos casos concretos y pertinentes a la controversia ante nos, consúltense: *Burger King Corp. v. N.L.R.B.*, supra; *Midstate Telephone v. N.L.R.B.*, supra; *N.L.R.B. v. N.Y. University Medical Ctr.*, 112 L.R.R.M. 2633 (2do Cir. 1983); *Borman's, Inc.*, 254 N.L.R.B. 1023 (1981), revocado en parte en *Borman's, Inc. v. N.L.R.B.*, 676 F.2d 1138 (6to Cir. 1982); *Pay'n Save Corp. v. N.L.R.B.*, supra; *Southwestern Bell Telephone Co.*, supra; *Davison-Paxon Co., Div. of R.H. Macy & Co. v. N.L.R.B.*, supra; *Consolidated Casinos Corp.*, 164 N.L.R.B. 950 (1967); *Eckerd's Market, Inc.*, 74 L.R.R.M. 1319 (1970); *Fabri-Tek Incorporated v. N.L.R.B.*, 352 F.2d 577 (8vo Cir. 1965); *N.L.R.B. v. Harrah's Club*, 337 F.2d 177 (9no Cir. 1964); *N.L.R.B. v. Floridan Hotel of Tampa, Inc.*, 318 F.2d 545 (5to Cir. 1963); *Floridin Hotel of Tampa, Inc*, 137 N.L.R.B. 1484 (1962); *Retail Store Employees Union Local 954, Etc. v. Rothman*, 298 F.2d 330 (Cir. D.C. 1962); *N.L.R.B. v. Essex Wire Corp.*, 245 F.2d 589 (9no Cir. 1957); *Larand Leisurelies, Inc. v. N.L.R.B.*, 523 F.2d 814 (6to Cir. 1975); *Caterpillar Tractor Co. v. National Labor Rel. Bd.*, 230 F.2d

357 (7mo Cir. 1956); *Mayrath Company*, 132 N.L.R.B. 1628 (1961), confirmado en *N.L.R.B. v. Mayrath Company*, 319 F.2d 424 (7mo Cir. 1963).

## VII

Del análisis de las decisiones antes citadas surge claramente que *no se puede* establecer una norma general para todos los casos. *Cada caso debe ser analizado de acuerdo con las circunstancias particulares que concurren en él.* Sin embargo, se puede *delinear los factores importantes que deben ser considerados al realizar el balance de intereses* en una controversia sobre uso de insignias de una unión, durante horas laborables, por aquellos empleados que en el descargo de sus funciones están en contacto directo con los clientes, abonados y/o público en general del patrono que establece la prohibición.

En primer lugar, se debe considerar si el uso de la insignia persigue un propósito protegido por la ley. De no ser así, su uso puede ser restringido de forma absoluta. *N.L.R.B. v. Harrah's Club*, supra. Si la insignia se utiliza luego de concluido el conflicto obrero-patronal, y su propósito es prolongar el encono entre las partes en conflicto, no existe un fin protegido. *Midstate Telephone v. N.L.R.B.*, supra.

En segundo lugar, debe considerarse la naturaleza del lenguaje utilizado en la insignia. Aquí se debe prestar atención al tamaño, el color, la forma y el contenido. En cuanto a su contenido se reconoce que como norma general el empleado, al entrar en una actividad concertada mediante el uso de insignias, no adquiere un derecho absoluto a utilizar epítetos irrespetuosos, denigrantes, obscenos, abusivos, injustos, etc., contra su patrono. Si el lenguaje utilizado en la insignia es vulgar, soez u obsceno, *cf. Caterpillar Tractor Co. v. National Labor Rel. Bd.*, supra; injusto

o inexacto, *Borman's, Inc. v. N.L.R.B.*, supra (la frase allí utilizada en una camiseta era: "I'm tired of bustin my ass."); burlón o profano, *Davison-Paxon Co., Div. of R.H. Macy & Co. v. N.L.R.B.*, supra (la frase utilizada en una camiseta era: "Ma Bell is a cheap mother."); belicoso u ofensivo (*disruptive or fighting words*), *Caterpillar Tractor Co. v. N.L.R.B.*, supra, (insignia de la unión en la que se leía: "Don't be a scab."); *Boeing Airplane Co. v. National Labor Relations Board*, 217 F.2d 369 (9no Cir. 1954) (insignia que exaltaba los ánimos entre uniones rivales); *cf. Kimble Glass Company*, 113 N.L.R.B. 577 (1955), confirmado en 230 F.2d 484 (6to Cir. 1956) (el patrono puede prohibir su utilización en su negocio durante horas laborables). Véase, además, *National Labor Relations Board v. Blue Bell*, 219 F.2d 796 (5to Cir. 1955).

■ Por otro lado, la Junta Nacional ha considerado como *circunstancias especiales*, que justifican la prohibición del uso de insignias de la unión en la ropa del empleado, cuando el lenguaje de la insignia puede exacerbar los ánimos y provocar desorden y división entre huelguistas y rompehuelgas, *United Aircraft Corp., Pratt & Whitney Div.*, 134 N.L.R.B. 1632 (1961); poner en peligro la seguridad de los empleados, *Andrews Wire Corporation*, 189 N.L.R.B. 108 (1971); o dañar equipo, maquinaria o productos del patrono, *Campbell Soup Company*, 159 N.L.R.B. 74 (1966), confirmado en 380 F.2d 372 (5to Cir. 1967).

■ En cuanto a la forma, el color y el tamaño del mensaje se considera que si éste es capaz de distraer a los empleados cuando estos realizan funciones sumamente técnicas y complejas que requieren extraordinaria concentración, el patrono puede prohibir el uso del mensaje para evitar defectos en sus productos y pérdidas económicas por dichos defectos. *Fabri-Tek, Incorporated v. N.L.R.B.*, supra. Al patrono también se le reconoce que puede prohibir el uso de insignias de la unión de un tamaño o forma distinta

al que su reglamentación permite utilizar. *Retail Store Employees Union Local 954, Etc. v. Rothman*, supra. Claro está, la regulación del tamaño de las insignias depende del efecto que tal insignia tenga sobre la concentración y atención que las labores afectadas requieran del empleado. El mero hecho de que la insignia o leyenda sea grande o tenga un color atractivo no justifica, per se, la prohibición. *Larand Leisurelies, Inc. v. N.L.R.B.*, supra.

En tercer lugar, debe considerarse la naturaleza de la regla patronal. Aquí debe examinarse si la regla era una preexistente que ha sido rigurosamente aplicada por el ·patrono contra todo tipo de insignia o si ella surge como respuesta a la actividad concertada. Las decisiones discutidas tienden a sostener con mayor frecuencia aquellas reglas o códigos de vestimenta que son preexistentes al conflicto sobre aquellas que se dictan con posterioridad al mismo. Éstas últimas ·tienden a demostrar motivaciones anti obreras de parte del patrono. *Cf.: Burger King Corp. v. N.L.R.B.*, supra; *Davison-Paxon Co., Div. of R.H. Macy & Co. v. N.L.R.B.*, supra; *N.L.R.B. v. Harrah's Club*, supra; *Retail Store Employees Union Local 954, Etc. v. Rothman*, supra. *Cf.: Larand Leisurelies, Inc. v. N.L.R.B.*, supra; *Pay'n Save Corp. v. N.L.R.B.*, supra.

La extensión de la prohibición es otro factor que ha de ser considerado. Las prohibiciones absolutas, sin limitar su alcance a lugar, tiempo o tipo de funciones, no son favorecidas.

En *Albertsons Inc.*, 272 N.L.R.B. 865 (1984), y *Page Avjet Corp.*, 275 N.L.R.B. 773 (1985), la Junta Nacional determinó que era irrazonable la prohibición del patrono en cuanto al uso de mensajes alusivos a un conflicto obrero-patronal cuando no se limitaba en tiempo, lugar y tipo de empleados que tuvieran o no contacto directo con el público. Resulta contraria a la ley una prohibición irrazonablemente amplia y sin criterios de tipo de función, lugar

y tiempo. Véanse, además: *Swan Coal Co.*, 271 N.L.R.B. 862 (1984); *Safeway Stores, Incorporated*, 110 N.L.R.B. 1718 (1954); *National Labor Relations Board v. W.T. Grant Co.*, 199 F.2d 711 (9no Cir. 1952).

Debe considerarse, además, la rigurosidad y uniformidad en la aplicación de la regla. Su aplicación indiscriminada milita contra la posición del patrono. *Fabri-Tek Incorporated v. N.L.R.B.*, supra; *Davison-Paxon Co., Div. of R.H. Macy Co. v. N.L.R.B.*, supra; *N.L.R.B. v. Harrah's Club*, supra. Cf. *Pay'n Save Corp. v. N.L.R.B.*, supra; *N.L.R.B. v. Essex Wire Corp.*, supra.

En cuarto lugar, al patrono se le reconoce, como interés protegido, el derecho a reglamentar la disciplina en su empresa y a mantener y promover la eficiencia, continuidad y productividad en su negocio. *Republic Aviation Corp. v. Board*, supra. Pero, además, se reconoce que aquellos negocios que dependen del patrocinio público y que están inmersos en el mercado competitivo tienen un interés particular en mantener y proyectar cierta imagen al consumidor. *Burger King Corp. v. N.L.R.B.*, supra; *Davison-Paxon Co., Div. of R.H. Macy & Co. v. N.L.R.B.* supra; *N.L.R.B. v. Harrah's Club*, supra; *Midstate Telephone v. N.L.R.B.*, supra. Ello permite sostener la aplicación rigurosa de reglas patronales que prohíben el uso de insignias durante horas laborables y en los uniformes del empleado con el fin de mantener una apariencia agradable ante todo el público y ante los clientes con quienes el empleado entra en contacto.[8]

Pero, nuevamente, el mero contacto con el público o los clientes del patrono no es, per se, suficiente justificación para prohibir el uso de botones, insignias, etc., alusi-

---

[8] Sobre el uso de camisetas con mensajes alusivos a la unión, véanse: *N.L.R.B. v. Power Equipment Company*, 313 F.2d 438 (6to Cir. 1963); *The De Vilbiss Company*, 102 N.L.R.B. 1317 (1953). Sobre el uso de gorras con dichos mensajes, véase *Int'l Longshoremen's Association (Independent), Etc.*, 127 N.L.R.B. 35 (1960).

vos a la unión y/o a una actividad concertada del sindicato durante horas laborables. *Ecker's Market, Inc.*, supra, pág. 1323. *Kimble Glass Co. v. N.L.R.B.*, 230 F.2d 484 (6to Cir.), *cert.* denegado 352 U.S. 836 (1956).

Las querellas o quejas del público o cliente pueden apoyar la regla del patrono. *N.L.R.B. v. Floridam Hotel*, supra.

Sin embargo, no es necesario que el patrono espere a que su producción o sus ventas disminuyan para implantar su prohibición. Una alta probabilidad de que sus ingresos, su producción o sus ventas disminuyan basta para justificar la norma si concurren otras circunstancias que fortalezcan su decisión. *N.L.R.B. v. Harrah's Club*, supra.

*Estos y otros factores concurrentes en el conflicto deben ser sopesados al momento de hacer el balance de intereses entre derechos contrapuestos en el conflicto obrero aquí en controversia.*

A la luz de estos precedentes, pasamos a examinar las circunstancias del caso ante nos.

## VIII

¿Existían en el caso de autos las circunstancias especiales que justifican la prohibición patronal? Concluimos que no existían y que la P.R.T.C. incurrió en la práctica ilícita que le fue imputada.

En primer lugar, la actuación de la Unión perseguía un propósito sindical protegido por la ley. Buscar apoyo público a su posición, así como ejercer presión psicológica sobre la P.R.T.C. para lograr un convenio colectivo a la brevedad posible es un propósito protegido en la ley, puesto que intenta adelantar la protección y ayuda mutua de los empleados. 29 L.P.R.A. sec. 65. El uso de la insignia era una actividad concertada protegida tanto constitucional como estatutariamente. Art. II, Sec. 18, Const. E.L.A., *supra.* Esa actividad, con tal propósito, estaba enmarcada dentro de un proceso de negociación entre las partes que se

había prolongado por espacio de un (1) año sin que se hubiera alcanzado un convenio colectivo definitivo en el cual los empleados tuvieran garantizados los términos y las condiciones de empleo en su trabajo.

En segundo lugar, el lenguaje de la leyenda precisamente estaba relacionado directamente con esa tardanza e incertidumbre de derechos que vivían los empleados. Su reclamo era claro: "queremos convenio colectivo ¡ahora!"

Por otro lado, ese lenguaje no es belicoso, ofensivo, denigrante, vulgar ni obsceno. Tampoco es abusivo, injusto o inexacto. En el contexto que se utilizó no era capaz de exacerbar los ánimos entre unionados, gerenciales y/o supervisores. *Tampoco hay prueba de facciones disidentes entre empleados o entre unionados de más de una unión, de suerte que estuviera en peligro la seguridad y el orden o la disciplina general en los talleres de trabajo. De hecho, no hay prueba en autos de ningún incidente de esta naturaleza.*

Por otro lado, la prueba irrefutada demuestra que los empleados que utilizaron las insignias (*e.g.* instaladores, reparadores, inspectores de terrenos) se desempeñaban en labores mecánicas sencillas para las cuales no se requería suma concentración al realizarlas. De suerte que el tamaño, la forma o el color del mensaje no tendría un efecto paralizante sobre las labores.

En tercer lugar, cabe destacar que la P.R.T.C. aprobó su regulación sobre uso de insignias *con posterioridad a que se iniciaran las conversaciones para entrar en un nuevo convenio colectivo. La regla no era preexistente al conflicto.* De hecho, las conversaciones se iniciaron en octubre de 1982 y la reglamentación fue aprobada en diciembre de ese año. Las partes no habían, para ese entonces, alcanzado un acuerdo final. Da la impresión de que la regla se aprueba en anticipación de la actividad concertada sobre uso de insignias que se origina en septiembre de 1983.

En cuanto a la extensión o alcance de la regla, recono-

cemos que aquí la prohibición impuesta por el patrono era limitada. Sólo se extendía a aquellos empleados que tenían contacto directo con los abonados o con el público. Además, sólo se extendía a las horas laborables de estos empleados. En cuanto a éstos, era absoluta.

La justificación patronal para la prohibición era mantener la continua, ininterrumpida y eficiente prestación de los servicios por esta utilidad cuasi pública al pueblo. Este es un propósito válido y legítimo. En *Torres Solano v. P.R.T.C.*, supra, pág. 514,(⁹) establecimos cuáles eran los objetivos del servicio público y sus exigencias a los que en él laboran; al respecto señalamos:

> *El servicio público exige de sus empleados una conducta compatible con los objetivos de excelencia, eficiencia y productividad y con los criterios de seguridad, armonía, orden, disciplina entre compañeros y continuidad de servicios al pueblo.* (Énfasis en el original.)

El medio utilizado para lograr los objetivos del patrono fue la prohibición absoluta de la utilización del mensaje por los empleados unionados que tenían contacto con el público o los abonados durante horas laborables. *Correspondía a la P.R.T.C. el peso de probar las circunstancias especiales.*

Sostiene la P.R.T.C. que el uso de la leyenda en horas laborables por aquellos empleados que tenían contacto con el público tendría el efecto de interrumpir las labores de estos empleados porque "precisamente en horas laborales, es que los empleados le explican al público el detalle y contenido del pegadizo ...". Alegato en apoyo a recurso de apelación, pág. 17.

---

(⁹) Aunque en *Torres Solano v. P.R.T.C.*, 127 D.P.R. 499 (1990), se trataba de un caso de un empleado gerencial cubierto por la Ley de Personal del Servicio Público de Puerto Rico, *los principios de administración pública y los objetivos del servicio público aplican de igual manera a los empleados unionados. A éstos, como a aquéllos, el Pueblo le exige igual eficiencia, productividad y excelencia en la prestación de servicios.*

*Valga apuntar que la P.R.T.C. no presentó prueba alguna ante la Junta de que efectivamente las labores de esos empleados se vieron interrumpidas por éstos explicar durante sus horas de trabajo al público o a los abonados lo que significaba el pegadizo. En el récord de la Junta existe ausencia total de esa prueba.* La P.R.T.C. descansó en la determinación que hiciera el tribunal de instancia en su Sentencia de 30 de septiembre de 1983, en el sentido de que existía el peligro real de interrupciones en el servicio. Esa determinación, hecha por el foro judicial, no estaba sustentada por la prueba.

Pero más aún, hay que considerar que el uso del mensaje por los unionados no se daba en el vacío. Ya la P.R.T.C. y la Unión llevaban más de un (1) año negociando y sin llegar a un acuerdo cuando se inicia la actividad concertada de los pegadizos. Durante ese proceso la Unión había realizado marchas, piquetes, protestas, conferencias de prensa en diversos canales televisivos, en la radio, etc., dirigidos a informar al público en general sobre sus reclamos en las negociaciones. El público y, en particular, los abonados de la P.R.T.C. no estaban ajenos al conflicto obrero-patronal. El mensaje venía, pues, a patentizar la posición de la Unión en el conflicto que públicamente se estaba dilucidando entre las partes. Resultaba especulativo sostener que el uso de pegadizos por aquellos empleados que tuvieran contacto con el público necesariamente los obligaba a detener sus labores para dar una conferencia sobre el pegadizo a toda persona que les preguntara.

El lenguaje del pegadizo era sencillo, claro y directo. Este se explica por sí solo. Junto a los piquetes, marchas, conferencias de prensa, etc., realizados por la Unión para adelantar su posición en las negociaciones, era de fácil entendimiento para el público. No vemos cómo el pegadizo podía interrumpir, de manera apreciable y significativa, las labores de los empleados unionados de la P.R.T.C. que

tenían contacto con el público durante sus horas laborables.

*El récord está huérfano de prueba que demuestre que la utilización del pegadizo afectó la eficiencia y continuidad de la prestación de servicios de la P.R.T.C. a sus abonados.* Al contrario, la implantación de la prohibición por la P.R.T.C. fue la que tuvo ese efecto paralizador en sus funciones.

Según la Oficial Examinadora, en este caso la prohibición en cuestión no fue aplicada discriminatoriamente por la P.R.T.C. De la prueba irrefutada presentada ante la Junta surge que a clasificaciones como las de Mensajero se les permitió continuar sus labores, luego de cuatro (4) horas de prohibición, pero no fue claro si fue con el pegadizo puesto en su ropa. Por la naturaleza de sus funciones, los mensajeros tenían contacto con el público, tanto con el público en general como con los abonados a través de las distintas oficinas comerciales del patrono. La prueba de la Unión fue en el sentido de que aun esas cuatro (4) horas que no se les permitió trabajar les fueron pagadas a los mensajeros. Pero tampoco, con relación a estos empleados, hubo evidencia de que sus funciones se vieron interrumpidas por el uso del pegadizo por éstos detener labores para explicar el mensaje.

Finalmente, sostiene la P.R.T.C. que el uso del pegadizo afectó su imagen ante el público y sus abonados. Ese argumento resulta inmeritorio. Este criterio ha sido determinante cuando el negocio en cuestión está inmerso en el mercado competitivo, esto es, que la supervivencia económica del negocio depende del patrocinio de sus clientes a sus servicios por encima del de la competencia. Pero recordemos que la P.R.T.C. tiene en Puerto Rico el monopolio de los servicios telefónicos y su clientela es cautiva. Difícilmente perderá el patrocinio de esta clientela porque sus unionados utilicen un mensaje alusivo a un conflicto obrero-patronal durante horas laborables.

*El análisis de las circunstancias concurrentes en este*

*caso nos lleva a concluir que la P.R.T.C. incumplió con su obligación de establecer las circunstancias especiales requeridas para justificar su prohibición al uso de mensajes por sus empleados unionados, actividad protegida por la constitución y la ley, alusivos a un conflicto obrero-patronal.*

██ Reiteradamente hemos sostenido que las decisiones y órdenes de la Junta merecen deferencia y respeto por parte de este Tribunal siempre que éstas estén apoyadas por evidencia sustancial en la totalidad del récord administrativo. *Landrón v. J.R.T.*, 87 D.P.R. 94 (1963); *J.R.T. v. Hosp. de la Concepción*, 114 D.P.R. 372 (1983), *cert.* denegado, 465 U.S. 1021 (1984).

Por los fundamentos expuestos, concluimos que, a la luz de la evaluación integral del récord, existe evidencia sustancial para sostener la decisión y orden de la Junta. *Landrón v. J.R.T.*, supra; *Universal Camera Corp. v. Labor Bd.*, 340 U.S. 474 (1951). Ésta no es caprichosa o arbitraria. Se ordena a la P.R.T.C. que le dé fiel cumplimiento.([10])

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Negrón García se inhibió. El Juez Asociado Señor Rebollo López disintió sin opinión escrita.

---

([10]) El hecho de que esta controversia data de 1983 y de que efectivamente la Unión Independiente de Empleados Telefónicos y la Puerto Rico Telephone Company llegaron y firmaron un nuevo convenio colectivo, no la convierte en académica. Por un lado, la regla patronal afectó de ochocientos treinta y cinco (835) a novecientos (900) unionados a quienes no se les permitió trabajar usando el pegadizo. Ésta está aún vigente. El periodo de tiempo en que no se les permitió trabajar varió en cada caso pero comprende el periodo entre el 14 al 30 de diciembre de 1983. Este tiempo no les fue compensado. Así que estos empleados tienen un interés pecuniario en el resultado del pleito.