# 2001 DTA 101

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL I DE SAN JUAN
PANEL III**

CONSTRUCTORA I. MELENDEZ, S.E.
Recurrente

v.

AUTORIDAD DE CARRETERAS Y TRANSPORTACION, CONSTRUCTORA JOSE CARRO, S.E.;
CARRO & CARRO ENTERPRISES; L.P.C. & D INC.; TAMRIO, INC.; CABIMAR, S.E.;
DEL VALLE GROUP S.P.; CARIBBEAN QUARRY, INC.; BYLEY CONSTRUCTION GROUP, INC.;
ROBLES ASPHALT; EQUIPOS Y CONSTRUCCIONES RVD
Recurridos

Núm. KLRA-00-00813

San Juan, Puerto Rico, a 23 de enero de 2001

Panel integrado por su Presidente, el Juez Negrón Soto
y los Jueces Segarra Olivero y Negroni Cintrón

Negrón Soto, Juez Ponente

## TEXTO COMPLETO DE LA RESOLUCION

Constructora I. Meléndez, S.E., en adelante recurrente, presentó este recurso solicitando la revisión de la adjudicación de subasta por $4,329,000.00 a favor de Constructora José Carro, S.E., en lo sucesivo Carro, emitida el 5 de octubre de 2000 por la Junta de Subastas de la Autoridad de Carreteras y Transportación, en adelante Junta.

Examinado el presente recurso de revisión, una moción en auxilio de jurisdicción solicitando la paralización de la adjudicación de la subasta -la cual denegamos en Resolución del 22 de noviembre pasado-, y las oposiciones sometidas por los recurridos, estamos en condiciones de resolver.

Por los fundamentos que exponemos más adelante, denegamos la expedición de este recurso. Consideremos la situación fáctica ante nos.

### I

El 18 de septiembre de 2000, se celebró la subasta para la construcción de la Carretera PR-301, Conector PR-101 y PR-301 en Cabo Rojo. Antes de adjudicarse la subasta, la recurrente impugnó la subasta mediante carta fechada el 19 de septiembre de 2000. No obstante ello, surge de la minuta del 26 de septiembre de 2000 que la Junta determinó que no procedían los planteamientos allí expresados.

Luego de analizar las propuestas sometidas y recibir la recomendación del Area de Construcción y Oficina de Administración de Contratos de la Autoridad de Carreteras y Transportación, en lo sucesivo Autoridad, el 5 de octubre de 2000, la Junta adjudicó a Carro la subasta por $4,329,000.00 como el postor más bajo que cumplía con las especificaciones de la misma. Mediante comunicación fechada el 6 de octubre de 2000,

28

notificada vía facsímil el día 9 del mismo mes y año, notificó dicha adjudicación a todos los licitadores, incluyendo a la recurrente, quien había presentado una oferta de $4,390,000.00.

Inconforme, el 19 de octubre de 2000, la recurrente solicitó la reconsideración de la adjudicación de la referida subasta. No habiendo la Junta tomado acción alguna con relación a ésta dentro del término requerido para ello, la recurrente presentó el recurso que nos ocupa, el 8 de noviembre de 2000. Le imputa a la Junta haber errado al:

" 1. ...aceptar la propuesta de Constructora José Carro, S.E. cuando la misma estaba incompleta, tenía marcas y tachaduras y no fue inicializada por los miembros de la Junta.

2. ...permitir que Constructora José Carro, S.E. presentara licitación desbalanceada en unas partidas y excesivas en otras partidas.

3. ...emitir una adjudicación de subasta sin fundamento."

## II

En su primer señalamiento de error la recurrente aduce que al inspeccionar el expediente original que le mostró la Junta el 6 de octubre de 2000, sólo encontró el "*Proposal Schedule*" de Carro, pero no así los otros formularios requeridos por el Artículo 102.07 ▮ del "*Standard Specifications for Road and Bridge Construction*'", adoptado como especificación del proyecto. No obstante, afirmó que desconocía si los documentos de dicha propuesta se encontraban en otra oficina de la Autoridad. Alegó, además, que el "*Proposal Schedule*" tenía tachaduras y marcas en las columnas de las partidas 21 a 25 y 29 a 38, por lo que debió rechazarse, conforme al Artículo 102.14 de las referidas especificaciones. ▮ Finalmente, sostuvo que el "*Proposal Schedule*" no fue iniciado por los miembros de la Junta, contrario a lo dispuesto en el Artículo VII G (5) del Reglamento de Subastas de la Autoridad, Núm. 02-001, aprobado el 30 de junio de 1995. ▮ En consecuencia, concluyó que la Junta debió haber rechazado dicha propuesta. No le asiste la razón.

En el apéndice de su alegato en oposición, la Autoridad acompañó los documentos que alegadamente Carro había omitido incluir, a saber: "*Bid Bond No. 160-24671 (3)*"; "*Non-collusive Affidavit*"; "*Eligibility Affidavit*"; "*Statement of the Bidder*"; y el "*Proposal Schedule*". Un examen de estos documentos, nos convence de que la Autoridad correctamente determinó que Carro sometió todos los documentos requeridos por el Artículo 102.07 del "*Standard Specifications for Road and Bridge Construction*". Apoya también esta contención, el hecho de que la misma parte recurrente expresó "*...que desconocemos si los documentos de la propuesta de Carro se encontraban en otra oficina de la... [Autoridad].*" ▮ Así, la recurrente no nos ha puesto en condiciones de determinar el incumplimiento que le imputa a Carro.

La Junta admite que las tachaduras y marcas fueron hechas por ella y no por el licitador agraciado. Asimismo, lo afirmó Carro. De un examen del documento presentado por la recurrente en su recurso, surge que éste era una copia utilizada por la Junta como instrumento de trabajo y no era la propuesta original presentada por Carro, ni una copia fiel y exacta de ésta. Por eso, el "*Proposal Schedule*" sometido por la Autoridad en su alegato carece de tachaduras y marcas. Ahora bien, examinemos la razón de ser de las mencionadas marcas en la copia del "*Proposal Schedule*".

En el documento titulado "*Instructions to Bidders*", en su inciso once (11), dice que:

"*The proposal schedule may include alternate items. These may be presented as:*

*a. A group of items which are alternate items to one or more group of items. In this case, a header on the proposal schedule will identify each group of items.*

*b. A set of two or more items which are alternate for one individual work. They will be identified by a lettered sequence with the descriptor "(Alt ___)" included in the name of the item. (For examples: The first set of alternate items will be identified as (Alt A), the second set of alternate items as (Alt B); and so on)."* ■

Examinada esta instrucción, debemos concluir que las partidas 21 a 25 son alternas a las partidas 29 a 33 del "*Proposal Schedule*". Más aún, notamos que esas marcas comprenden básicamente las palabras "*si*" y "*no*" escritas en las referidas partidas. Por lo tanto, las marcas y tachaduras no son otra cosa que la selección de la Junta de cuáles de las partidas alternas serían las utilizadas para la adjudicación de la subasta y, posteriormente, del otorgamiento del contrato. Por ello, en la notificación de la adjudicación de la subasta se expresó "...*que la subasta... fue adjudicada... al postor más bajo que cumple con las especificaciones de la misma, Construcciones [sic] José Carro, por la cantidad de su proposición de $4,329,000.00 Alt. 21, 22, 23, 24 y 25.*" ■ (Énfasis Nuestro.) Ello significa que la subasta fue adjudicada con las partidas alternas 21 a la 25, en lugar de las 29 a la 33. Por eso, las primeras indicaban un "*si*" y las segundas un "*no*", según enumeradas en el "*Proposal Schedule*" presentado por la recurrente.

El señalamiento de la ausencia de las firmas de los miembros de la Junta, no requiere gran esfuerzo para descartarlo. Como vimos, el "*Proposal Schedule*" que examinó y presentó la recurrente carecía de esas iniciales porque el mismo, en realidad, era una copia de éste, que se utilizó como instrumento de trabajo de la Junta. Sin embargo, al examinar una copia fiel y exacta del original presentado por la Autoridad, observamos que éste contiene las aludidas iniciales en su parte inferior derecha.

### III

En su segundo apuntamiento de error, la recurrente alega que el "*Proposal Schedule*" de Carro revela serias irregularidades en su desglose por partida, las cuales ameritan su descalificación. Aduce que el precio por unidad de la partida 7 es más bajo que el estimado en el análisis de licitación preparado por la Autoridad. Este material se describe como "*Borrow Class D*", que su costo totalizó $4,500.00, fue cotizado a $1.00 la unidad cuando el estimado de la Autoridad era de $8.00. Igual desbalance sostiene se apreciaba en las partidas 22 a 24, donde se observa que Carro cotizó para una tubería de 24" a $110.00 y para otra de 36" sólo $60.00, por lo que el costo de la tubería de mayor tamaño era menor que la más pequeña. Finalmente, aduce que las partidas 14, 74 y 112 fueron cotizadas exageradamente altas en comparación con los costos estimados de la Autoridad. Tampoco le asiste la razón.

Examinemos el alegado desbalance en las partidas 22, 23 y 24. Respecto a la partida 22, Carro cotizó para una tubería de 24" un precio unitario de $110.00, siendo $100.00 el estimado por la Autoridad; para la partida 23 correspondiente a una tubería de 36", cotizó un precio unitario de $60.00, la cual fue estimada en $200.00 y, finalmente, en la partida para la tubería de 42", cotizó exactamente el mismo precio estimado por la Autoridad. Como puede observarse, el alegado desbalance en dichas partidas se reduce a que el precio unitario cotizado para la partida 23 fue uno muy bajo. De otra parte, de las recomendaciones del Area de Construcción de la Oficina de Administración de Contratos de la Autoridad surge que las partidas 14, 74, y 112 tienen precios unitarios altos.

Asumiendo que las partidas 7 y 23 fueran muy bajas y las 14, 74 y 112 fueran altas, ello no afecta la validez de la adjudicación realizada considerado el "*Proposal Schedule*" en su totalidad, el cual contenía 147 partidas. De hecho, de lo expuesto por Carro en su alegato surge que su cotización no es exageradamente baja. A esos efectos, éste sostiene que:

*"Considerando que: (1) el material Borrow Class D está disponible en el lugar donde se va a realizar el proyecto, (2) que el mismo será excavado como parte de la construcción, (3) que no habrá un costo de acarreo ni aplicarán las tarifas de la Comisión de Servicio Público, puesto que el material no será transportado por vías públicas, y (4) que el costo de la excavación le será compensado al contratista como parte del precio total de la subasta,* ■ *la cotización de Carro para la partida 7 de la propuesta no es exageradamente baja, como*

*sostiene Meléndez. Por el contrario, el estimado es razonable y sensato, pues de no emplearse este material que es extraído como parte de las excavaciones, en el mismo proyecto, habría que buscar la forma de disponer del mismo fuera del proyecto, con el consabido deber de solicitarle al Departamento de Recursos Naturales un permiso para depositar materiales, y el riesgo de daños al ambiente y a nuestras carreteras.*

*Las partidas número veintidós (22) a la veinticuatro (24).*

*Estas partidas consisten de tubería de 24" (Item 22, 36", (Item 23)) y 42" (Item 24). Meléndez cuestiona que en la propuesta de Carro se haya estimado un precio unitario más bajo para la tubería de 36" que para la tubería de 24". La razón es sencilla: Carro dispone de cantidades suficientes de esa tubería en particular, de 36", de excedentes de otros proyectos, y para las cuales no tiene que pagar un precio adicional debido a que ya pagó por ellas. La tubería de 24" tendrá que comprarla de un suplidor, para realizar este proyecto, y, por lo tanto, no puede ofrecer para esta partida número 22 un precio competitivo como el que pudo ofrecer para la tubería de mayor tamaño (36")."*

En cuanto a la partida 14, Carro señaló que la construcción del *"Bridge Construction"* allí requerido es distinto a la construcción de terraplenes, por lo que el costo del primero es mayor que el del segundo y que, en consecuencia, no podía cotizar esa partida sin tomar en consideración la naturaleza de la obra. Respecto a las partidas 70, 74 y 112, que ciertamente son dos rótulos, Carro indicó que éstos serían subcontratados a quien le ofreció la cotización más baja. De otro lado, la recurrente, en su moción de reconsideración del 15 de diciembre de 2000, objetó ese señalamiento en forma general señalando, por ejemplo, en lo relativo a que Carro sostuvo que la tubería de 36" era una sobrante que tenía de otros proyectos, partida 23, que ello no aparecía en el récord de la subasta.

Asimismo, de las recomendaciones antes mencionadas surge que Carro *"...tiene amplia experiencia construyendo proyectos para la Autoridad de Carreteras y Transportación. En estos momentos construye varios proyectos del programa de construcción de la Autoridad. En términos generales, este contratista termina los proyectos dentro del tiempo de contrato revisado..."*; ▇ y que la propuesta sometida por ésta es un doce por ciento (12%) más bajo que el estimado preparado por la Autoridad. ▇ Es decir, su propuesta es $646,075.25, menor que el precio estimado por la Autoridad, ▇ y $61,000.00, menor que la oferta de la recurrente.

Según el Artículo 102.14 (b) de los *"Standard Specifications for Road and Bridge Construction"*, *"[t]he Authority may reject (Enfasis nuestro) a proposal in which its prices are obviously unbalanced."* Es decir, que un desbalance en una propuesta no es un factor obligatorio para rechazarla. Ahora veamos si en realidad estamos frente a una propuesta desbalanceada.

Este Foro apelativo, en *Rexach Construction Co., Inc. v. Junta de Subastas, Autoridad de Carreteras y Transportación, Et. Als.*, Sentencia del 11 de febrero de 1997, KLRA-96-00327, por voz del señor Juez, Hon. Gilberto Gierbolini, expresó en la pág. 6 que:

*"Una subasta desbalanceada es aquélla que contiene precios nominales para algunas partidas de trabajo y precios exageradamente altos para otras partidas, Stamato & Co. v. City of New Brunswick, 90 A.2d 34, 36 (1952). No obstante, está claramente establecido que:*

*El mero hecho de que un licitador haya sometido una propuesta desbalanceada, no opera automáticamente para invalidar la adjudicación del contrato a ese licitador. Tiene que existir, además, prueba de colusión o conducta fraudulenta de parte de ese licitador y la agencia, su ingeniero u otro agente, o prueba de otra irregularidad de naturaleza tan sustancial que afecte el carácter justo y competitivo de la subasta. En ausencia de fraude, corrupción o abuso de discreción, la determinación de los oficiales encargados de otorgar un contrato, no será alterada por el tribunal. Id."* (Traducción nuestra).

Aun asumiendo que hubo partidas desbalanceadas, no existe, ni se aportó evidencia de colusión o conducta fraudulenta de Carro, ni prueba de que la Junta actuó de manera caprichosa o ilegal en la adjudicación de la subasta. ■ En ausencia de fraude, ilegalidad alguna o abuso de discreción manifiesto de la Junta, no debemos intervenir con la adjudicación de la subasta por esas razones.

## IV

En su tercer y último señalamiento de error, la recurrente alega que la notificación de adjudicación de la subasta emitida por la Junta carece de fundamentos, ya que ésta no expresa los factores o criterios considerados para tomar tal determinación. Sostiene que la Junta lo único que hizo fue adoptar ciegamente unas recomendaciones, sin hacer análisis o discutir tales recomendaciones. Se equivoca nuevamente.

El Artículo IX A (7) del Reglamento de Subastas de la Autoridad, Núm. 02-001, aprobado el 30 de junio de 1995, contempla que *"[e]l Presidente de la Junta tendrá la responsabilidad de notificar por escrito a los licitadores participantes en la subasta la decisión tomada por el Director."* En *L.P.C. & D. Inc. v. Autoridad de Carreteras y Transportación y Otros,* res. el 27 de diciembre de 1999, **2000 J.T.S. 9,** a la pág. 477, al disponer cómo debía ser esa notificación, se dijo lo siguiente:

*"Por todo lo antes expuesto, resolvemos que la notificación de la adjudicación de una subasta debe ser fundamentada, al menos, de forma sumaria y sucinta. Por lo menos, debe incluir la siguiente información: los nombres de los licitadores en la subasta y una síntesis de sus propuestas; los factores o criterios que se tomaron en cuenta para adjudicar la subasta; los defectos, si alguno, que tuvieran las propuestas de los licitadores perdidosos y la disponibilidad y el plazo para solicitar la reconsideración y la revisión judicial.*

*De ordinario, las agencias administrativas deben cumplir estrictamente con esta normativa. No obstante, en casos excepcionales cuando por alguna razón válida la agencia no pueda así resolver, en la reconsideración, la entidad gubernamental deberá exponer los fundamentos que propiciaron su decisión.*

*La norma que hoy promulgamos hace efectivo el ejercicio del derecho a solicitar revisión judicial de las adjudicaciones de subasta y posibilita a los tribunales ejercer su función revisora. Finalmente, esto evita decisiones arbitrarias, irrazonables o caprichosas, por parte de las agencias administrativas, aspecto que cobra fundamental importancia en el caso de subastas públicas, en virtud de las cuales se desembolsan fondos públicos."*

En el caso que nos ocupa, la notificación estuvo suficientemente fundamentada, aunque de forma sumaria y sucinta. Veamos. Se incluyeron los nombres de los licitadores que sometieron las propuestas en la subasta y sus ofertas. El factor o criterio considerado para adjudicar la subasta a Carro fue que su propuesta fue la más baja que cumplía con las especificaciones de la subasta. Se consignaron las irregularidades encontradas durante el proceso de evaluación de las propuestas de los licitadores y, finalmente, se le advirtió a los licitadores de su derecho a solicitar reconsideración y la revisión judicial ante este Foro Apelativo.

## V

Es doctrina reiterada que las decisiones administrativas gozan de una presunción de regularidad y corrección y que nuestra intervención con las mismas está limitada por la ley y la jurisprudencia. Ley Núm. 170 de 12 de agosto de 1988, conocida como la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. sec. 2101 *et seq.; Misión Industrial de P.R. v. Junta de Planificación,* res. el 30 de junio de 1998, **98 J.T.S. 79;** *Misión Industrial de P.R. v. Junta de Planificación,* res. el 21 de marzo de 1997, **97 J.T.S. 34;** *Maisonet Felicié v. F.S.E.,* res. el 30 de diciembre de 1996, **96 J.T.S. 169;** *Fac. C. Soc. Aplicadas, Inc. v. C.E.E.,* 133 D.P.R. 521 (1993); *Henríquez v. C.E.S.,* 120 D.P.R. 194, 210 (1987); *M. & B. S., Inc. v. Dpto. de Agricultura,* 118 D.P.R. 319, 331 (1987); *Murphy Bernabé v. Tribunal Superior,* 103 D.P.R. 692, 699 (1975). En consecuencia, las conclusiones e interpretaciones de los organismos administrativos especializados merecen gran consideración y respeto, por lo que el ejercicio de nuestra función revisora está limitado a determinar si la agencia actuó

arbitraria, ilegal o tan irrazonablemente que su actuación constituyó un abuso de discreción. *Misión Industrial de P.R. v. Junta de Planificación, supra; Reyes Salcedo v. Policía de P.R.*, res. el 13 de mayo de 1997, **97 J.T. S. 58**; *Fac. C. Soc. Aplicadas, Inc. v. C.E.E., supra; Fuertes y otros v. A.R.P.E.*, 134 D.P.R. 947 (1993); *Murphy Bernabé v. Tribunal Superior, supra*. Esto se cumple cuando se encuentra una base racional en el récord administrativo para sostener las conclusiones de la agencia, sin sustituir el criterio del tribunal por el de la agencia administrativa. *Misión Industrial de P.R. v. Junta de Planificación, supra; Metropolitana, S.E. v. A.R.P.E.*, 138 D.P.R. 200 (1995); *Hilton Hotels v. Junta Salario Mínimo*, 74 D.P.R. 670, 703 (1953).

Por esta razón, los tribunales deben otorgarle deferencia a las determinaciones de hechos si las mismas están sostenidas por evidencia sustancial en el expediente administrativo. Véase: *P.R.T.C. v. Unión Indep. de Emp. Telefónicos*, 131 D.P.R. 171, 211 (1992). *"Evidencia sustancial es aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión"*, *Hilton Hotels v. Junta Salario Mínimo, supra*, a la pág. 687, aunque exista prueba conflictiva de la cual puedan inferirse conclusiones distintas a las que la agencia adopta. *J.R.T. v. Línea Suprema Inc.*, 89 D.P.R. 840, 849 (1964).

Lo anterior impone en quien impugna la decisión administrativa, el deber de probar que se ha actuado en forma caprichosa, arbitraria o en clara violación de los derechos constitucionales fundamentales. Al que recurre de una decisión administrativa, le corresponde el peso de establecer en su recurso que no existe base racional que sostenga la decisión que es objeto de impugnación. *Catalytic Ind. Maint. Co. v. F.S.E.*, 121 D.P.R. 98, 102 (1988); *Henríquez v. C.E.S., supra*.

Nuestro Tribunal Supremo ha sostenido que la determinación de una agencia no está fundada en evidencia sustancial cuando la parte recurrente demuestra la existencia de *"otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia, hasta el punto de que un tribunal no pueda, concienzudamente, concluir que la evidencia sea sustancial, en vista de la prueba presentada... y hasta el punto que se demuestre claramente que la decisión [del organismo administrativo] no está justificada por una evaluación justa del peso de la prueba"* que tuvo ante su consideración. *Hilton Hotels v. Junta Salario Mínimo, supra*, a la pág. 686, según citado en *Metropolitana S.E. v. A.R.P.E., supra*, a la pág. 767.

Es norma reiterada de derecho que en el proceso de revisión de una decisión emitida por una agencia administrativa, los tribunales de apelación deben concederle a sus dictámenes gran peso y deferencia en vista de su vasta experiencia y conocimiento especializado. *Rivera Rentas v. A & C Development Corp.*, res. el 26 de noviembre de 1997, **97 J.T.S. 143**; *Agosto Serrano v. F.S.E.*, 132 D.P.R. 866 (1993); *Murphy Bernabé v. Tribunal Superior, supra*, a la pág. 699. Así, los tribunales deben ser *"cautelosos"* al intervenir con las determinaciones de organismos administrativos. *Viajes Gallardo v. Clavell*, 131 D.P.R. 275, 290 (1992).

Por eso, en estos casos, como mencionamos anteriormente, la revisión judicial debe limitarse a determinar si la agencia actuó de manera arbitraria e ilegal, o en una forma tan irrazonable que su actuación constituyó un abuso de discreción, o cuando las determinaciones de hechos formuladas por la agencia administrativa no encuentren apoyo en evidencia sustancial existente en la totalidad del récord. *Misión Industrial de P.R. v. Junta de Planificación, supra; Maisonet Felicié v. F.S.E., supra; Fuertes y otros v. A.R.P.E., supra*. A tenor con esta perspectiva, la Regla 66 del Reglamento del Tribunal del Circuito de Apelaciones, 4 L.P.R.A. Ap. XXIIA, establece los siguientes criterios para determinar si se expide o no un auto de revisión:

*"(A) Si la regla o el reglamento, de su faz, incumplen las disposiciones de ley, o si se impugna el procedimiento seguido al adoptar dicha regla o reglamento; (B) Si el remedio y la disposición de la orden, resolución o decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho, o producto de una actuación arbitraria, ilegal o irrazonable; (C) Si la decisión recurrida no está apoyada por evidencia sustancial; (D) Si la expedición del auto evita el fracaso de la justicia."*

33

## VI

Al aplicar estas normas de derecho, es forzoso concluir que la adjudicación de la subasta realizada por la Junta, como agencia administrativa, goza de una presunción de regularidad y corrección. Por ende, nos merece gran consideración y respeto y debemos concederle gran deferencia, en vista de su vasta experiencia y conocimiento especializado. No habiendo la recurrente demostrado que la Junta haya actuado arbitraria, ilegal o tan irrazonablemente que su actuación constituyera un abuso de discreción, estamos impedidos de intervenir con su decisión. Más aún, al examinar el récord encontramos que no sólo había base racional, sino evidencia sustancial para sostener la adjudicación impugnada.

## VII

Por todo lo anteriormente expresado, denegamos la expedición del auto.

Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 2001 DTA 101

**1.** El Artículo 102.07, *supra*, pág. 200 del apéndice del recurso, dispone:

*"Preparation of Proposals-*

*a. The bidder shall submit his proposal on the forms furnished by the Authority in the contract book. These forms include the proposal schedule, bid bond, non-collusive affidavit, statement of the bidder and other documents as specified in the contract book. In addition to these forms, the bidder shall submit an accurate and exact copy of the original proposal schedule submitted."*

**2.** El Artículo 102.14, *ibid*, dispone:

*"Rejection of Proposals and Disqualification of Bidders-*

*a. The Board of Awards will reject a proposal for any of the following irregularities:*

*...*

*(7) If the proposal has erasures and/or changes which are not properly initialed by the bidder and which may tend to make the proposal incomplete, indefinite or ambiguous as to its meaning."*

**3.** El Artículo VII G (5) del Reglamento de Subastas, *supra*, pág. 178 del apéndice del recurso, expresa que-

*"5. Los miembros de la Junta escribirán en tinta o bolígrafo sus iniciales en las tres (3) proposiciones más bajas."*

**4.** Recurso de revisión, pág. 5.

**5.** Apéndice del Alegato de la Autoridad, pág. 51.

**6.** Apéndice del recurso de revisión, pág. 121.

**7.** Su nota al calce número 4 dice: *"Véase la partida 5 (Item No. 5) de la propuesta, "Unclassified Excavation".*

**8.** Apéndice del recurso de revisión, págs. 105-106.

**9.** Apéndice del recurso de revisión, pág. 107.

**10.** El estimado de la Autoridad fue de $4,975,075.25, según surge del acta de la reunión de la Junta celebrada el 18 de septiembre de 2000.

**11.** Sostiene la recurrente en su recurso, pág. 9, sin expresar fundamento alguno:

*"...que la cotización de Constructora José Carro, S.E. no se ajustó a la realidad del proyecto subastado, los fondos públicos podrían peligrar en partidas donde el precio unitario está elevado y su cantidad depende de unas condiciones variables en el suelo. En fin, la A.C.T. [Autoridad] corre un riesgo económico 4 veces más alto que su estimado al permitir a Constructora José Carro, S.E. cotizar desproporcionadamente a sus estimados en partidas que pueden aumentar por las exigencias del proyecto.*

*Nada más lejos de la realidad. Bajo ningún concepto en derecho, ello puede sostenerse en las circunstancias y ante las razones que Carro aduce para haber formulado unas cotizaciones bajas. Nadie debe aprovecharse de los fondos públicos; al contrario, éstos deben ser invertidos sólo bajo las más estrictas normas y vigilancia que requiere el fin y orden público."* Véase, *De Jesús González v. Autoridad de Carreteras*, **99 J.T.S. 72.**

En igual forma, no obliga a la Autoridad, en caso de que se requieran otros rótulos adicionales, el precio fijado en la propuesta por Carro, ya que siendo un trabajo adicional, se requeriría una nueva cotización, y en todo caso, la misma Autoridad los podía hacer a su costo. Obviamente, sería ilegal pagar por un rótulo no cubierto en la subasta una cuantía mayor a su verdadero costo.