# 2003 DTA 80

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL I DE SAN JUAN
PANEL II**

GENOVEVA LOZADA SANCHEZ
Recurrente

v.

ADMINISTRACION DE LOS SISTEMAS DE RETIRO DE LOS
EMPLEADOS DE GOBIERNO Y LA JUDICATURA
Recurrida

Núm. KLRA-2002-00737

San Juan, Puerto Rico, a 28 de abril de 2003

Panel integrado por su Presidenta, la Juez Rodríguez de Oronoz,
la Juez Peñagarícano Soler y la Juez Bajandas Vélez

Bajandas Vélez, Juez Ponente

**TEXTO COMPLETO DE LA SENTENCIA**

La Sra. Genoveva Lozada Sánchez nos solicita, mediante el recurso de revisión de epígrafe, la revocación

de la Resolución emitida por la Junta de Síndicos de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura (Junta de Síndicos) el 17 de mayo de 2002 y notificada el 22 de agosto de 2002. Mediante dicha resolución, la Junta de Síndicos confirmó la denegatoria de la pensión por incapacidad ocupacional solicitada por la recurrente a la Administración de Sistemas de Retiro (Administración), a tenor con la Ley Núm. 447 del 15 de mayo de 1951, según enmendada (*"Ley Núm. 447"*); 3 L.P.R.A. §769 y §761.

Analizados cuidadosamente el expediente y el derecho aplicable, resolvemos expedir el auto de revisión solicitado y confirmar la Resolución recurrida.

# I

La Sra. Genoveva Lozada Sánchez se desempeñaba como cocinera del Departamento de Educación. Sus tareas consistían principalmente en fregar, esterilizar, hacer limpieza, pesar alimentos y sacar los mismos del almacén, entre otros. Contaba con 17.75 años acreditados al Sistema de Retiro.

El 20 de agosto de 1991, la Sra. Lozada Sánchez sufrió un primer accidente en el trabajo, el cual fue relacionado y compensado por la Corporación del Fondo del Seguro del Estado (Fondo) en el caso núm. 92-11-01274-8. Luego de ser sometida a tratamiento médico, y dada de alta con incapacidad parcial permanente, el diagnóstico del Administrador del Fondo arrojó los siguientes padecimientos: condición lumbar (5%), condición emocional o depresión típica (20%), condición cervical y espondilosis (15%), condición dorsal (5%) y condición lumbar HNP L5-S1. Apéndice de la Recurrente, Anejo 7, pág. 22.

El 29 de junio de 1996, la Sra. Lozada Sánchez sufrió otro accidente en el trabajo (caso Núm. 98-23-00735-8). Como consecuencia de éste, el Fondo diagnosticó *"Strain Cervical, Strain L/S y Strain Rodilla Izquierda"*. El 14 de octubre de 1998, la Sra. Lozada Sánchez fue dada de alta *"con incapacidad"* luego de recibir tratamiento médico correspondiente. Apéndice de la Recurrente, Anejo 1, pág. 1. Según surge del expediente, el Fondo le otorgó a la recurrente incapacidad total y permanente de las funciones fisiológicas generales, como resultado de ambos accidentes.

El 2 de septiembre de 1999, la Sra. Lozada Sánchez solicitó una pensión por incapacidad ocupacional ante la Administración de los Sistemas de Retiro, de conformidad con la Ley Núm. 447. Expuso que *"debido al fuerte dolor en la espalda, me impide realizar las tareas, ya que no puedo hacer fuerza"*. Indicó además, que *"estoy atravesando por una fuerte depresión emocional"*. Apéndice de la Recurrente, Anejo 3, págs. 8-9.

La Administración de Retiro emitió su decisión el 30 de octubre de 2000. Sostuvo que *"De los informes médicos que constan en nuestro poder relativos a su condición física, se ha determinado que aún está física y mentalmente capacitado(a) para desempeñar labores en el servicio público."* Además, se indicó que *"[l]as condiciones no relacionadas por el Fondo del Seguro del Estado, también fueron evaluadas. No obstante, médicamente se determinó que las mismas no son incapacitantes"*. Apéndice de la Recurrente, Anejo 11, pág. 64.

Oportunamente, el 10 de noviembre de 2000, la Sra. Lozada Sánchez presentó su apelación ante la Junta de Síndicos. Allí planteó que la evidencia médica sometida a la Administración cumplía con lo establecido en el Artículo 9 de la Ley Núm. 447. Solicitó copias de toda la evidencia e informes médicos considerados. Luego de celebrada la vista en su fondo el 1 de octubre de 2001, la Junta de Síndicos emitió la resolución recurrida el 17 de mayo de 2002 y la notificó el 22 de agosto de 2002, confirmando la denegatoria de la Administración.

En dicha resolución, la Junta tomó en consideración los siguientes informes médicos realizados para la solicitud de incapacidad ante la Administración. Primeramente, consideró el informe del generalista Dr. Martín Rosa de 26 de agosto de 1999. Dicho informe, se estimó, estaba *"falto de información y hallazgos a ser utilizado a los fines de determinar incapacidad."* ■ Se tomó en cuenta un segundo informe médico presentado

ante la Administración por el Dr. Andy A. Martínez. La Junta concluyó que dicho informe poseía, al igual que el primero, información *"extremadamente escueta"*. ■

Entre los restantes informes médicos evaluados por la Junta que constan en la resolución recurrida, se encontraban los del Dr. César Soto Gautier, ■ el Dr. Miguel A. Cubano, ■ el Dr. Hiram Mercado, ■ el Dr. René Dietrich, ■ y Dr. Jorge L. Suria Colón. ■

La Sra. Lozada Sánchez solicitó reconsideración ante la Junta de Síndicos el 9 de septiembre de 2002. Esta última no se expresó dentro del término dispuesto en ley para ello. Así las cosas, la Sra. Lozada Sánchez presentó ante nos el recurso que nos ocupa, señalando que la Junta de Síndicos incurrió en los errores siguientes:

*"ERRO LA HONORABLE JUNTA DE SINDICOS AL DETERMINAR QUE LAS CONDICIONES RELACIONADAS POR LA CORPORACION DEL FONDO DEL SEGURO DEL ESTADO NO SON LO SUFICIENTEMENTE SEVERAS PARA HACER ACREEDORA A LA RECURRENTE DE UNA INCAPACIDAD OCUPACIONAL, O, EN SU DEFECTO, DE UNA INCAPACIDAD NO OCUPACIONAL.*

*ERRO LA JUNTA DE SINDICOS AL NO CONSIDERAR LOS FACTORES VOCACIONALES EN UNION A LOS IMPEDIMENTOS MEDICOS DE LA RECURRENTE PARA DETERMINAR LA INCAPACIDAD OCUPACIONAL O NO OCUPACIONAL."*

En esencia, sostiene la Sra. Lozada Sánchez que existe suficiente prueba médica de incapacidad total y permanente para concederle los beneficios de la pensión, ya que el Fondo relacionó todas las condiciones sufridas, otorgándole incapacidad total e inhabilitándola para cualquier trabajo remunerado. Estima, además, que la Junta emitió una resolución contradictoria, pues si bien establece el hecho de que el Fondo otorgó incapacidad total, concluyó que las condiciones que sufre la Sra. Lozada Sánchez no son lo suficientemente severas para conceder el beneficio. Del mismo modo, argumentó que la Junta no tomó en cuenta la condición emocional que atraviesa la Sra. Lozada Sánchez como un todo, junto con los padecimientos físicos. Finalmente, la recurrente alega que: *"Aunque si bien se ha determinado que las decisiones de otros foros administrativos no tienen porqué obligar a las determinaciones de la Administración de los Sistemas de Retiro, entendemos que el presente caso es diferente porque ya se determinó la relación causal ocupacional de las condiciones médicas que incapacitan total y permanentemente a la recurrente y se determinó su severidad a base del 100% de incapacidad que le otorgó la CFSE [el Fondo]. En adición a la determinación de la CFSE, la Administración del Seguro Social Federal le concedió sus beneficios sin que hiciera falta una vista."* Solicitud de Revisión, pág. 5. ■

Emitimos resolución el 30 de octubre de 2002 concediéndole 30 días a la parte recurrida para que, por conducto del Procurador General, fijara su posición en cuanto al recurso de revisión de autos. En su escrito oportunamente presentado, la parte recurrida sostiene principalmente que la determinación de la Junta de Síndicos se encuentra avalada por evidencia sustancial que obra en el expediente administrativo, por lo cual debemos ejercer nuestra deferencia. En su comparecencia, el Procurador incluye dos informes médicos adicionales de asesores de la Administración que fueron evaluados para sustentar la posición de ésta. ■

Contando así con la comparecencia de ambas partes, pasamos a resolver.

## II

La Ley Núm. 447 de 15 de mayo de 1951, mejor conocida como la *"Ley de Retiro del Personal del Gobierno"* (*"Ley Núm. 447"*), 3 L.P.R.A. §761 *et seq.*, es una ley de carácter general que provee beneficios de retiro para la mayoría de los empleados del gobierno del Estado Libre Asociado de Puerto Rico. Dicha ley establece un plan de pensiones de retiro, incluyendo a su vez las pensiones a otorgarse por incapacidad

ocupacional. Los Artículos 9 y 11 de la Ley Núm. 447 establecen los parámetros para establecer incapacidad ocupacional y no ocupacional. El artículo 9 (sec. 779) dispone que:

*"Todo participante que, como resultado de una incapacidad que se origine por causa del empleo y surja en el curso del mismo, quedare incapacitado para el servicio, tendrá derecho a recibir una anualidad por incapacidad ocupacional, siempre que:*

*(a) Se recibiere suficiente prueba médica en cuanto a la incapacidad mental o física del participante conforme a los criterios que mediante reglamento fije el Administrador.*

*(b) El participante o el patrono, de acuerdo con los reglamentos de la Junta, notifique al Administrador con respecto a dicha incapacidad.*

*(c) Que el Fondo del Seguro del Estado determine que el accidente o enfermedad provino de cualquier función del trabajo o que sea inherentemente relacionado al trabajo o empleo.*

*(d) El participante tendrá que radicar la solicitud, sustentada con suficiente prueba médica, dentro de los ciento ochenta (180) días en que se relacione la condición por la cual radica su solicitud".*

Por otro lado, el Artículo 10 (sec. 770) de dicha ley dispone, en cuanto a la incapacidad no ocupacional, que:

*"Todo participante que, teniendo por lo menos 10 años de servicios acreditados, se inhabilitare para el servicio, debido a un estado mental o físico y que por razón de ese estado estuviere incapacitado para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiera asignado, tendrá derecho a una anualidad por incapacidad no ocupacional. El retiro del participante tendrá lugar a petición o solicitud suya o a petición del jefe de su departamento u oficina, mientras esté en servicio el mencionado participante, y de acuerdo con las reglas sobre anualidades por incapacidad provistas en la sec. 771 de este título..."* .

De otra parte, la Regla 24.2 del Reglamento General para la Concesión de Pensiones, Beneficios y Derechos Núm. 4930, promulgado por el Administrador para implantar las disposiciones de la Ley Núm. 447, establece, en cuanto a la incapacidad ocupacional, los siguientes requisitos: (1) que el participante esté en el servicio activo a la fecha de la radicación de la solicitud; (2) que se reciba suficiente prueba médica en cuanto a la incapacidad mental o física del participante; (c) que el Fondo haya determinado que la condición incapacitante esté relacionada con el empleo y la misma es compensable; (d) que el participante o su patrono notifique de la incapacidad al Administrador del Fondo dentro de los (6) seis meses siguientes a la fecha en que el Fondo haya determinado la relación de la incapacidad con el empleo.

Asimismo, la Regla 24.4 del aludido Reglamento establece que:

*"Si de la evidencia médica que consta en el expediente y conforme el listado de criterios médicos ("Adult Listings") establecidos para determinar incapacidad y del análisis e investigación que realicen los técnicos en determinación de incapacidad designados por el Administrador, no se pudiese determinar con certeza la incapacidad, se le podrá requerir al participante que se someta a aquellos exámenes médicos adicionales que se entiendan necesarios para adjudicar en sus méritos la petición de beneficios por incapacidad. Los exámenes médicos adicionales serán realizados por médicos seleccionados por el Administrador. Recibidos los resultados de dichos exámenes, el médico asesor hará la determinación final sobre incapacidad y someterá su recomendación al Administrador. Se considerará capacitado al participante, si no está total y permanentemente incapacitado e imposibilitado para cumplir los deberes de cualquier cargo que su patrono le hubiere asignado o para trabajar en cualquier empleo retribuido, con un sueldo o retribución por lo*

*menos igual a la que está percibiendo.*" (Énfasis nuestro).

De las disposiciones arriba expuestas se colige que es obligación del empleado demostrar que está total y permanentemente incapacitado para realizar los deberes de su cargo o de cualquier otro trabajo asignado por su patrono. El Tribunal Supremo ha reiterado que la incapacidad de un empleado debe ser de tal naturaleza que le inhabilite para las funciones de su empleo o de cualquier otro de naturaleza remunerativa. *Sánchez v. A.S.R.E.G. J.*, 116 D.P.R. 372, 376 (1985). Cónsono con dicho principio, es necesaria prueba médica fehaciente de que un empleado está total y permanentemente incapacitado mental o físicamente para ser acreedor de la compensación según mediante reglamento fije el Administrador.

Aclarado dicho extremo, debemos esbozar los parámetros para la revisión judicial de las agencias administrativas. Como se sabe, a toda determinación administrativa le cobija una presunción de legalidad y corrección. *E.L.A. v. Lucas Malavé h/n/c Supermercado Jardines de Caparra*, \_\_\_\_ D.P.R. \_\_\_\_ (2002), **2002 J.T.S. 103**. Dicha presunción deberá sostenerse por los tribunales a menos que la misma logre derrotarse. *A.R. P.E. v. Junta de Apelaciones Sobre Construcciones y Lotificaciones*, 124 D.P.R. 858, 864 (1989); *Henríquez v. Consejo de Educación Superior,* 120 D.P.R. 194, 210 (1987); *Murphy Bernabé v. Tribunal Superior*, 103 D.P.R. 692, 699 (1975). Ello, debido a que las agencias administrativas poseen la experiencia y conocimientos altamente especializados sobre los asuntos que están dentro del ámbito de sus facultades y responsabilidades. *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.,* 133 D.P.R. 521, 533 (1993); *Asoc. Drs. Med. Cui. Salud v. Morales*, 133 D.P.R. 567, 589 (1993).

En vista de lo anterior, resulta que toda intervención con dichas determinaciones sólo estará justificada cuando la agencia haya obrado arbitraria, ilegalmente, o en forma tan irrazonable que su actuación constituya un abuso de discreción. Del mismo modo se intervendrá cuando la determinación no pueda ser sostenida a la luz de la doctrina de la evidencia sustancial. *Mun. de San Juan v. J.C.A.,* **2000 J.T.S. 193**, 152 D.P.R. \_\_\_\_ (2000); *Misión Industrial de P.R., Inc. v. Junta de Planificación*, 146 D.P.R. 64, 131 (1998); *Fuertes v. A.R.P.E.,* 134 D. P.R. 947, 953 (1993); *Murphy Bernabé v. Tribunal Superior*, 103 D.P.R. 692, 699 (1975).

El principio de la evidencia sustancial limita la intervención judicial con las determinaciones de hechos de un organismo administrativo, en la medida en que éstas estén sostenidas por evidencia que surja del expediente administrativo, considerado en su totalidad. *Metropolitana, S.E. v. A.R.P.E.,* 138 D.P.R. 200, (1995); *Puerto Rico Telephone Co. v. Unión Independiente*, 131 D.P.R. 171, 211 (1992).

El principio jurisprudencial de la evidencia sustancial se acogió en la sección 4.5 de la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.), Ley Núm. 170 del 12 de agosto de 1988, según enmendada, 3 L.P.R.A. sec. 2175. Dicho artículo dispone, en lo pertinente, que "*...las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el Tribunal, si se basan en evidencia sustancial que obre en el expediente administrativo*". A estos fines, se ha definido como "*aquella [prueba] pertinente que una mente razonable pueda aceptar como adecuada para sostener una conclusión*". *Ramírez v. Departamento de Salud*, 147 D.P.R. \_\_\_\_\_ (1999), **99 J.T.S. 47**; *Associated Insurance v. Comisionado de Seguros*, 144 D.P.R. 425, 437 (1997); *Hilton Hotels v. Junta de Salario Mínimo*, 74 D.P.R. 670, 687 (1953).

La determinación judicial de que no existe evidencia sustancial que sostenga las determinaciones de la agencia administrativa conlleva que la parte afectada demuestre que existe "*otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia hasta el punto de que un tribunal no pueda concienzudamente concluir que la evidencia sea sustancial, en vista de la prueba presentada... y hasta el punto que se demuestre claramente que la decisión [del organismo administrativo] no está justificada por una evaluación justa del peso de la prueba*" que le fue sometida. *Metropolitana v. A.R.P.E., supra*, a la pág. 213, (citando a *Hilton Hotels v. Junta de Salario Mínimo, supra*).

## III

Procedemos ahora a discutir los errores planteados por la recurrente. En primer lugar, señala que erró la Junta de Síndicos al determinar que las condiciones no son lo suficientemente severas para otorgarle incapacidad ocupacional, o, en su defecto, no ocupacional, a la Sra. Lozada Sánchez. No le asiste la razón.

De la evidencia que obra en el expediente ante nos, surge copiosa evidencia de pruebas médicas a las que fue sometida la Sra. Lozada Sánchez desde el año 1991, desde su primer accidente en el trabajo hasta el presente. La prueba médica evaluada por la Junta de Síndicos en su resolución, de ninguna manera establece de forma concluyente una incapacidad total y permanente que inhabilite a la Sra. Lozada Sánchez para realizar trabajo remunerado alguno. Dicho de otra manera, el expediente carece de prueba que establezca contundentemente su incapacidad para trabajar.

Existe, además prueba adicional, según indicáramos anteriormente, de que el expediente médico no satisface los criterios de los "*Adult Listings*" tanto para la condición física como la mental de la recurrente. En específico, la Dra. Fernández Abalde, y el Dr. Díaz Montaño indicaron que la prueba médica del expediente no llenaba los criterios de ley para conceder los beneficios que pretende la recurrente al amparo de la Ley Núm. 447.

De otra parte, la Junta de Síndicos concluyó en su resolución que dos de los médicos que realizaron pruebas a la recurrente en ocasión de su solicitud ante la Administración, en particular el Dr. Rosa y el Dr. Martínez, produjeron informes escuetos y faltos de información o hallazgos que pudieran mover a la Junta de Síndicos a fallar a favor de la recurrente. Véase notas 1 y 2, *ante*. La restante prueba médica que obra en el expediente tampoco sustenta de forma expresa la incapacidad que inhabilite a la recurrente a realizar trabajo alguno. Con la sola excepción del Dr. Miguel Cubano quien pronosticó que la recurrente "*is not rehabilitable for her job or any other one*", no existe otra prueba médica concluyente cuyo diagnóstico establezca condiciones total y permanentemente incapacitantes.

Notamos, a modo de ejemplo, que el CT Scan de la región de la espina lumbar realizado el 21 de febrero de 1998 arrojó un resultado normal. Véase nota 6, *ante*. De otra parte, la rodilla izquierda también resultó "*normal*" en un examen de resonancia magnética (MRI) realizado a la recurrente en la misma fecha.

Del expediente se puede advertir claramente que la mayoría de los estudios psiquiátricos realizados recomiendan la continuación de tratamiento psiquiátrico adicional, debido al estado depresivo que sufre la recurrente. De hecho, el neurocirujano Dr. Mercado que evaluó a la recurrente en la Comisión Industrial encontró que los "*reflejos de la paciente están completamente normal*". Intimó que es el problema emocional de la recurrente el factor más crítico de sus padecimientos, al señalar que "*es de primera importancia en el cuadro sintomático de la paciente*". A pesar de ello, surge de los autos que la severidad de su condición nunca ha ameritado su hospitalización u otras medidas severas análogas, más allá de la continuación de tratamiento psiquiátrico adicional. Por ejemplo, la prueba médica del Dr. Fuentes, también siquiatra, determinó que no alucina ni presenta delirios ni fobias y que tampoco tiene ideas suicidas ni homicidas. Además, concluyó que su memoria y orientación son normales. Véase nota 8, *ante*.

Por último, debemos puntualizar la evaluación de la neuróloga Dra. Evelyn López Ajá, quien señaló que la Sra. Lozada Sánchez realizó movimientos alternantes, repetitivos y rápidos con las cuatro extremidades. Determinó que ésta puede cargar, halar, y empujar objetos de mediano peso y pesados. También señaló que puede viajar, estar en alturas, y guiar.

Analizado el expediente y su variada prueba médica, concluimos que la Junta de Síndicos emitió una decisión fundamentada en la totalidad del expediente administrativo; que la misma no es arbitraria e irrazonable, y cumple cabalmente con es estándar de evidencia sustancial. Diferimos, por tanto, de la

contención de la recurrente en cuanto a que el único informe médico que ignora la severidad de su condición es el de la Dra. Ajá. Si bien es cierto que existen varios informes médicos sobre la severidad de su condición depresiva, ninguno de ellos, excepto el del Dr. Cubano, sostiene su inhabilidad para realizar algún trabajo remunerado.

Conforme a los conocidos principios de revisión judicial, corresponde a la parte recurrente mostrar otra prueba en el expediente que de forma suficiente reduzca o menoscabe el valor de la evidencia impugnada, de manera de que con dicha evidencia, no se pueda concluir que la agencia no fue razonable de acuerdo con la totalidad de la prueba. Estimamos que en el caso de autos, la recurrente no nos ha puesto en posición de resolver que la Junta de Síndicos fue irrazonable y caprichosa al denegar la solicitud de beneficios por incapacidad.

Respecto al segundo error planteado, argumenta la recurrente que era necesario tomar en consideración los criterios vocacionales, tales como la edad, educación y experiencias de trabajo de la recurrente al momento de tomar la determinación sobre incapacidad. Entendemos que no estamos, de nuevo, en posición de resolver dicho extremo, en tanto y en cuanto evidencia de tal naturaleza no forma parte de la resolución recurrida, ni fue debidamente planteada ante la consideración de la Junta de Síndicos.

Nos resta discutir el planteamiento de la recurrente a los efectos de que la determinación de incapacidad hecha sumariamente por la Administración del Seguro Social debió formar parte de la consideración de la Junta de Síndicos en su determinación. Como se sabe, la determinación que a favor de la Sra. Lozada Sánchez hiciera la agencia federal del Seguro Social no obliga a la Administración de los Sistemas de Retiro. ██ La Administración, como agencia independiente creada para implantar la Ley de Retiro del Personal del Gobierno, *supra,* sólo viene obligada a tomar determinaciones atendiendo a su propio Reglamento 4930, *supra.*

Resolvemos, por tanto, que la prueba que consta en el expediente apoya la conclusión de la Junta de Síndicos respecto a que la recurrente, aunque padece de varios problemas de índole emocional que ciertamente han disminuido su capacidad para el empleo que desempeñaba, está aún capacitada para realizar, si no el mismo y en igual medida, al menos otro trabajo de índole remunerativo. Considerada toda la prueba que consta en autos, se sostienen las conclusiones de la agencia.

## IV

Por los fundamentos anteriormente expresados, se expide el auto de revisión solicitado y se confirma la resolución emitida por la Junta de Síndicos el 17 de mayo de 2002 y notificada el 22 de agosto de 2002.

Lo acordó y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 2003 DTA 80

**1.** El diagnóstico del Dr. Rosa refleja, en cuanto a la mejoría anticipada, *"Reservado"*. En cuanto a la condición mental de la paciente, el Dr. Rosa indicó que existe *"Tratamiento para los nervios con el Dr. Miguel A. Cubano (Siquiatra)"*. Advirtió la existencia de *"Strain Lumbo-sacral"* y en la rodilla izquierda. Véase Apéndice de la Recurrente, pág. 80, Resolución Recurrida, pág. 2.

**2.** El Dr. Martínez se expresa en cuanto a la mejoría como *"desconocida"*. La información sobre condición orgánica, opina la Junta, es *"sustancialmente negativa"* excepto en lo que respecta a limitaciones de movimiento en la espalda. En cuanto a la condición mental se dijo *"Nervios Depresiva con Ansiedad"*; y en cuanto a otras condiciones *"Herniación Discal [paciente] fue referida a siquiatra"*. El informe hace referencia a los medicamentos y la respuesta a los mismos como

"*inestable*". El diagnóstico reza "*Hernia Discal L5-S1, Nervios, Depresión*". El pronóstico es "*desconocido; [paciente] lleva tratamiento psiquiátrico*". *Id.*

**3.** Apéndice de la Recurrente, pág. 80, Resolución recurrida, pág. 2. El Dr. Soto Gautier, radiólogo, realizó una tomografía de la región lumbar el 19 de diciembre de 1995, indicó: "*Impresión: Tomographic findings which are strongly suggestive of a small disc herniation L5-S1 with lateralization towards the right*".

**4.** Apéndice de la Recurrente, pág. 81, Resolución recurrida, pág. 3. El Dr. Cubano, Siquiatra, realizó un informe sobre la condición emocional de la paciente, cuya primera visita fue el 29 de julio de 1996 y la última el 8 de diciembre de 1999. Informó el perito que la apelante no ha tenido hospitalizaciones por causa de su condición.

**5.** Apéndice de la Recurrente, pág. 81, Resolución recurrida, pág. 3,. El Dr. Mercado rindió su informe el 14 de octubre de 1997. Diagnosticó un "'*Síndrome Doloroso lumbar*' *en una paciente donde predomina [sic] elementos depresivos*". Describió su condición lumbar como una de tipo mecánico. Señaló que "*Desde el punto de vista clínico no podemos establecer un paralelismo entre el cuadro sintomático y el aparentemente [sic] hallazgo de un HNP L5-S1, información que solamente obtenemos por la copia del resultado médico en vista médica del 25 de abril de 1997 (no hay informe en el expediente para poder evaluar dicho informe). Los reflejos de la paciente están completamente normal. Una herniación discal L5-S1 de afectar comprensivamente, debería por lo menos disminuir un reflejo aquiliano, aunque no necesariamente si la condición es leve o no irritativa a nivel de raíz. Desde el punto de vista neuroquirúrgico, no entiendo indicación para neurocirugía.*"

**6.** El Dr. Dietrich realizó un CT de la espina lumbar el 21 de febrero de 1998. Diagnosticó: "*Study compatible with bulging annulus fibrosus at L4-L5. Otherwise the CT scan of lumbar spine is normal.*" A su vez realizó un MRI el 23 de febrero de 1998: "*Focal area of increased signal intensity without extension to the articular surface in the posterior horn of the medical meniscus is compatible with mucinoud degeneration. No evidence of the meniscal tear. Otherwise the MRI of the left knee is normal.*"

**7.** El Dr. Suria Colón, de la Comisión Industrial, realizó un exámen mental de la paciente: "*El examen mental mostró una mujer de estatura mediana y peso mediano. Es blanca con ojos negros y pelo gris canoso. Viste descuidadamente y luce apática. Su memoria estaba intacta y no había desórdenes perceptuales. Estaba orientada en tiempo, lugar y persona. El pensamiento fue lógico y coherente. El contenido del pensamiento se centralizó en quejas de malestar afectivo.*" Su impresión diagnóstica fue Desorden Depresivo y recomendó tratamiento psiquiátrico adicional. Apéndice de la Recurrente, pág. 16.

**8.** La Solicitud de Revisión destaca la existencia de cierta prueba médica no mencionada en la resolución recurrida, la que transcribimos a continuación:

"*La psicóloga, Dinorah Saldaña, encontró una Depresión no Específica y la refirió a evaluación psiquiátrica.*

*Dr. Miguel Castro, Siquiatra, diagnosticó Depresión Mayor con un pronóstico reservado y recomendó tratamiento psiquiátrico.*

*Dr. Hirám Mercado, neurocirujano de la Comisión Industrial, hizo recomendación neuroquirúrgica:*

"*Se recomiendan cuidados de espalda y atender a su problema emocional, que a mi opinión es de primera importancia en el cuadro actual sintomático de la paciente. Se recomienda reducción de peso y cuidado del cuello y espalda.*"

*Dr. Jorge Suria, Siquiatra de la Comisión Industrial, autorizó tratamiento médico adicional bajo el Fondo debido al cuadro de desorden depresivo de la recurrente.*

*Dr. Miguel Cubano, Siquiatra, caracterizó la paciente como "... verborreic with psicomotor acceleration. Has flight of ideas with mental blocking when under stress. (...) Orientation: Person: Adequate, Place: She gets lost in known places, time: forgets dates and time. Memory: Immediate: poor forgets what she was going to do, Recent: Can not remember what she did sometime ago, Remote: Has difficulty with the sequence of remote events. Attention and Concentration: is poor, she*

*is easily distracted and can not concentrate."* El Dr. Cubano además indicó que la recurrente no puede seguir una tarea sólo hasta después de unos minutos. No tolera estrés ni ruidos. Finalmente, emitió el siguiente pronóstico:*" Poor, she is not rehabilitable for her job or any other one."*

Dra. Evelyn Rodríguez Ajá, Neuróloga, quien evaluó a la recurrente a nombre de la Administración, señaló que *"hizo movimientos alternantes, repetitivos, rápidos con las cuatro extremidades. Puede cargar, halar, empujar objetos de mediano peso. Puede agarrar objetos pesados. Hizo pinza, puños, oposición. Puede viajar, estar en alturas, guiar, no se inclinó por completo".* El Pronóstico fue *"fair".*

Dr. Rodrigo Freytes, Siquiatra, señaló que: *Se siente triste, desesperada. No tiene deseos de hacer nada. Se siente muy ansiosa. (...) Está aislada. No se relaciona con vecinos. (...) No toleraba estar con los compañeros de trabajo. (...) No alucina ni presenta delirios, ni fobias. Tiene ideas de minusvalía e ideas de impotencia física. No tiene ideas suicidas no ideas homicidas.* El pronóstico fue *"reservado".*

**9.** Escrito en Cumplimiento de Orden, pág. 6. Dra. Lydia Fernández Abalde, asesora médico-siquiátra, señaló el 6 de octubre de 2000 que la condición emocional de la recurrente no llena ni iguala los criterios A 1 y B del listado 12.06 u otro para una incapacidad ocupacional o no ocupacional por condición mental.

Dr. Rafael Díaz Montaño, asesor médico, el 4 de octubre de 2000, indicó que la condición neurológica de la paciente no llena el listado 1.05-C-1-2.

**10.** Véase nota 8, *ante.*

**11.** Para un análisis de la interrelación de los criterios del Seguro Social y del Fondo del Seguro del Estado con los de nuestra Ley de Retiro, véase la Opinión de Conformidad del Juez Asociado Jaime B. Fuster Berlingieri en *Afanador Irizarry v. Roger Electric, Co.,* **2002 J.T.S. 62**, pág. 1032.